## Richmond.

SHEELER'S ADM'R v. C. & O. R. R. COMPANY.

### DECEMBER 3d, 1885.

1. NEGLIGENT INJURIES—*Contributory negligence.*—In order to maintain an action for an injury, it must be proved that the injury was caused by the negligence of the defendant, or his agents, and it must not appear from the evidence that want of ordinary care and prudence on the part of the plaintiff *directly* contributed to the injury.  *N. & W. R. R. Co.* v. *Ferguson*, 79 Va. 241.

2. IDEM—*Negligence—Onus probandi.*—Where negligence is the gravamen of the action, the law does not impute it, but the burden of proving it rests on him who alleges it.

3. CONTRIBUTORY NEGLIGENCE—*Case at bar.*—On defendant's railroad is a bridge with sides five feet high.  The top is one foot higher than the cab floor, and 13½ inches of passing engines, making it unsafe for one to be on outside of engine passing bridge.  The bridge is properly built with respect to safety of persons on passing engines, and projects no nearer passing engines than other bridges on that and other roads.  S. well knew this bridge, having passed over it on engines daily for months.  Whilst the engine, whereof S. was on November 27, 1883, fireman, was running 18 miles an hour, he, without orders and in violation of the rules, opened the ash pan, by means whereof fire fell out and set ablazing some greased woolen ravellings on box of a driving-wheel of engine.  The fire could not be extinguished without stopping the train, and it was sufficient to extinguish it at the next stopping place.  But without orders, and unnecessarily, S. got down on side of engine and tender, with his right foot on step of engine and left on step of tender, clasping with right hand hand-holder on engine, and holding in his left hand a small hose attached to spigot on tender, swung his body out and forward in a stooping posture, and with left arm resting under side of engine, was attempting to extinguish the blaze,

when he was struck by the upright side of the bridge and was killed.

HELD :

 S., and not the defendant company, was guilty of negligence, but for which injury would not have occurred, and hence is not entitled to recover. •

Error to judgment of circuit court of Bath county, in an action of trespass on the case, wherein the administrator of Thomas A. Sheeler, deceased, was plaintiff, and the Chesapeake and Ohio Railroad Company was defendant. Argued at Staunton, but decided at Richmond.

The object of the suit was to recover damages for the negligent killing of the plaintiff's intestate by the defendant. At the trial the defendant demurred to the plaintiff's evidence. The jury rendered a verdict that the plaintiff recover of the defendant the sum of $2,500 damages, subject to the opinion of the court on the demurrer. The court gave judgment thereon for the defendant, and the plaintiff obtained a writ of error.

Opinion states the case.

*Tucker & Tucker*, for the plaintiff in error.

*Robertson, Parrish* and *Wickham*, for the defendant in error.

RICHARDSON, J., delivered the opinion of the court.

The declaration contains but one count, the gravamen of which is, that the deceased, a firemen in the employment of the defendant company, lost his life while in the discharge of his duty as such fireman, by reason of the defendant's negligent and careless construction, at a point in the line of its road, of a bridge, the upright sides of which were not sufficiently distant from the engines and cars when passing over same to

allow and permit the plaintiff's intestate, as such fireman, to properly discharge his duties as firemen without incurring unreasonable risk and danger to his life and limbs.

After the general averment of defendant's failure and negligence in not erecting, as was its duty, safe structures and bridges in the respects above stated, the declaration proceeds: "And by reason of the carelessness and negligence of said defendant in not properly constructing said bridges and the upright sides thereto as aforesaid, the plaintiff avers that his intestate, while in the due and faithful discharge of his duty to said defendant as fireman, as aforesaid, upon one of the engines of said defendant, drawing a train of freight cars, and while exercising due care and caution, was violently hurled and thrown against a certain bridge, and the upright sides thereof, to-wit: on the 27th day of November, 1883, at the county of Bath aforesaid, at a point upon defendant's railway, between Copeland's and Crane's stations, on the line of said railway, and was knocked down and killed by means thereof. And the plaintiff avers that his intestate did not know, and had no means of knowing, while in the proper and faithful discharge of his said duties as fireman, as aforesaid, of the defects and dangers of the said bridge, and its upright sides thereto, and of the danger, the proximity, and closeness of said bridge, and upright sides thereto, to the said engines and cars of defendant while passing over and along the same, though the same was well known, and had been well known, to the said defendant for a long time," &c. And the declaration concludes with the averment that, but for the gross negligence of the defendant in the premises, and its failure to notify and warn the plaintiff's intestate of said dangers, the decedent would not have been injured, wounded and killed, whereby, &c. Such is the body and essence of the negligence charged against the defendant.

The defendant demurred to the plaintiff's declaration, and

the court overruled the demurrer.   Thereupon the defendant pleaded not guilty, upon which plea issue was joined.

At the trial in the court below, when all the evidence on both sides had been heard by the jury, the defendant demurred to the plaintiff's evidence, and the plaintiff joined therein. The jury found a verdict in favor of the plaintiff, and assessed the damages at $2,500, subject to the opinion and judgment of the court on the demurrer to evidence.   On consideration, the court gave judgment for the defendant on the demurrer; and on the application of the plaintiff a writ of error to said judgment was awarded by one of the judges of this court.

The unfortunate occurrence, which resulted in the death of the defendant, Thomas A. Sheeler, happened on the night of the 27th day of November, 1883, at a point on the defendant's line of railway, between Copeland's and Crane's stations.   The deceased (Sheeler) had been in the employment of the defendant for over three years—first as brakeman, and then, for the last eight months of that period, next preceding and at the time of his death, as fireman.   Prior to the occurrence which resulted in his death, Sheeler had been regarded as a good and reliable railroad man, and had been recommended for, and been promised, promotion to the position of engineer.

It does not distinctly appear in evidence whether the train, on the engine of which Sheeler was fireman, was a passenger or a freight train; but, from what is disclosed, the fair, if not necessary, inference is that it was the latter.   On that train R. J. Sweetwood was the engineer, having charge of the engine which drew the train, Sheeler, the fireman on said engine, and W. C. Miller, front brakeman; the latter being the only person who saw and knew exactly how Sheeler met his death, and the circumstances leading thereto.   On the night in question this train left Clifton Forge—one witness says, about 12 o'clock, and another says about 11 o'clock and fifty minutes, under a special

*time order* on *No.* 3 (the express train), and having until 12:40 to reach Mason's tunnel, some fifteen miles distant, where it was to stop for said express train to pass, going west—Miller, the front brakeman on the train, at or about Copeland, came forward and seated himself on the fireman's box in the cab, on the left side of the boiler near to and in full view of Sheeler, the fireman. Sweetwood, the engineer, was at his position, forward, on the right side of the boiler. The engine was what is known as a combination engine, with boiler five feet in diameter, extending back through the cab, so that Sweetwood, from his position, could not see Sheeler in the position in which the latter was at the time of the accident, he being on the steps of the engine and tender on the left side thereof. From Miller's testimony it appears that, as the train was passing, or as it left Copeland's, Sheeler shook his grate vigorously for two or three minutes, and soon thereafter discovered that some waste woolen ravellings, saturated with grease, on top of the box of the rear driving wheel of the engine, was on fire and blazing; seeing the fire, Sheeler took a small hose attached to spigot on tender, got down on outside of engine and tender, with his right foot on the step of the engine and his left on step of tender; and, clasping with his right hand the hand-holder on engine, and holding in his left hand the hose, swung his body out and forward in a stooping posture, and, with his left arm reaching round under the side of the engine, was attempting to extinguish the fire, when he struck against the upright side of the bridge, was knocked down and killed; the train at the time running at the rate of eighteen or twenty miles an hour.

Sheeler got in the position in which he was killed in about three hundred yards of the bridge. Miller, who was looking at him, and not thinking they were so near the bridge, happened to look forward, and, by the aid of the head-light, saw the bridge, but just had time to turn when he saw Sheeler fall,

struck by the bridge. Miller called to Sweetwood across the boiler; the train was stopped as quick as possible, and the two went back, assisted in taking up Sheeler and putting him in the caboose of the train, and, by reason of the time thus lost and the danger of a collision with the coming express train, had to hurry away so as to get on the siding at Crane's, for the express to pass. Crane's is three or four miles west of Mason's tunnel, and by that distance short of the point to which the train had been ordered to go by the *time order*. From the bridge to Crane's, where the train stopped for the express to pass, there seems to have been no fireman. On arriving at the latter place it was discovered that the ash-pan of the engine was open. To open the ash-pan when a train is in motion, was in violation of the company's orders. Miller says: "The accident happened from Sheeler getting down on the steps to put the fire out. A fireman could not run by there four or five months without knowing about the bridge." The same witness says: "When Sheeler shook the grate bars as the engine was running along, the live coals fell out and bounded against the ties up to the driving-wheel spokes, and they threw them up against the waste on the driving box. That's how it was set on fire."

From the statement of Sweetwood, the engineer, under whom Sheeler was fireman, it appears that he knew nothing of how the accident occurred, as, from his position as engineer, he could not see Sheeler in the position in which he was when struck; that a man standing on the engine steps could not, in his opinion, safely pass the bridge, though he never saw a man try it, and would not try it himself; that the top of the bridge side is about eighteen inches higher than the floor of the cab, and that he supposed the distance or space between side of passing engine and side of bridge to be about nine or ten inches, but that he never examined the bridge; that he did not, and

would not, have ordered Sheeler into the position in which he was, and that his duty as fireman never required him to get on outside of engine or tender when in motion, and that Sheeler took the position in which he was killed voluntarily and at his own risk, and that Sheeler could not have put out the fire in the way he was trying, as the rapidly revolving wheel would prevent the water from passing through the spokes to the fire; that if he (the engineer) had discovered the fire, it would have been his duty to put it out as quick as possible, but that it would have been necessary to stop the train to do so, and that, as the waste on fire was a very small quantity, and burned slowly, and there being nothing at that point which the fire could harm, he would have waited until he reached his next stopping place (Mason's tunnel), before attempting to put the fire out.

The same witness testifies that the train was running up grade at the time of the accident; that on such grade the fireman's duty is to stand down in the center of the front of the tender, and shovel coal into the furnace at short intervals, in which position he is kept pretty busy; but on a level or down grade the fireman may get up in the cab and sit on the fireman's box, and look out for the next up grade; that a fireman may shake the bars of his grate when he pleases, but must keep the ash-pan closed when the engine is in motion, and that he (Sheeler) knew this, because he (Sweetwood) had told him when he commenced as fireman; and that the ash-pan would not have been open if Sheeler had discharged his duty, and that the ash-pan could not have been open without Sheeler knowing it, as the handle to it is a heavy iron bar which lifts up from the floor and stands in the face of the fireman when the pan is open, but when the pan is shut the handle is down to the floor. Sweetwood, the engineer, also explains the difference between the ash-pan damper and the ash-pan slides, and shows that the former, in one class of engines, is at the

bottom of the side of the ash-pan, and in another class is at the top of the side of the ash-pan, while the slides are in the bottom of the ash-pan, in moving which, by lifting up the handle, the contents of the pan are permitted to escape. He also testifies that, besides the duties of a fireman when the engine is running, it is his duty to rub and help to keep the engine clean when it is standing; and he says that firemen are sometimes apt to open the ash-pan when the engine is running, and thereby enable the contents to escape, and thus save themselves disagreeable work when the engine stops. The witness, Sweetwood, also describes that part of the road where this accident occurred as notoriously the most dangerous between Charlottesville and Clifton Forge, on account of the numerous bridges and tunnels, there being, in that part of the road, over Pad's creek, and within the distance of two miles, three bridges—it being at the middle bridge that Sheeler was killed; and he testifies that Sheeler, as fireman and brakeman, had passed this bridge on an average once a day for over three years, and as often in the daytime as at night.

Omitting more minor details of statement, such are the facts of the case brought out by the witness introduced by the plaintiff, except certain printed rules of the company referred to in the testimony, which will be noticed further on.

The defendant introduced only one witness, E. L. Crenshaw, civil engineer by profession, and for six years, next preceding the death of Sheeler, had been in the employment of the defendant as assistant division engineer between Richmond and Huntington, the bridge in question being in his charge. This witness, speaking from actual knowledge, describes the bridge; and his statement is uncontradicted by anything in the evidence for the plaintiff, or any inference that can be fairly drawn therefrom. The substance of his statement is: That the bridge is a half through bridge, with sides just five feet high—that is, to

comb of roof—a through bridge being a covered bridge; that the space between passing engines and sides of bridge is just thirteen and a half inches, and that the top of sides is just one foot higher than floor of cab; that there is less danger to a trainman of being struck by such a bridge than by a through bridge, and that it is not safe to be on the outside of the engine in passing such a structure; that in Sheeler's position, as described by the witness Miller, he could not have passed any through or half through bridge, or single track tunnel on that line of railway; that Coleman's tunnel, through which Sheeler had just passed, is just eleven feet eight inches in width, and that there are five other bridges on the road (known to witness) just like the bridge in question; that the bridge was an old bridge, had been known to witness for six years, and in that time had not been materially altered; that besides bridges and tunnels, there are projecting structures on all roads just as close to the track as the bridge in question, and closer, that would strike a man in the position in which Sheeler was; and that if the bridge, where Sheeler was killed, had been one foot or eighteen inches wider even, he would have been killed. And the witness says: "The bridge is properly built."

Looking to the pleadings, the facts, and the principles of law applicable to the case, we fail to perceive any ground upon which the plaintiff below, the plaintiff in error here, could be entitled to prevail.

As we have seen, the plaintiff's claim to damages is predicated solely of the alleged negligence of the defendent in error in carelessly and negligently constructing a certain bridge, and the upright sides thereof, in the line of its road, so close to the track that the plaintiff's intestate, a fireman in the employment of said company, while in the due discharge of his duty and while exercising due care and caution as such fireman, was hurled and thrown against the side of said bridge, and was killed by means thereof.

Discussing the degree of care which the law exacts of a master, it is said in 2 *Thompson on Negligence,* at p. 985: "It is the duty of railroad companies to keep their works, and all portions of their track, in such repair, and so watched and tended, as to insure the safety of all who may lawfully be upon them, whether passengers, or servants, or others. They are bound to furnish a safe road, and sufficient and safe machinery and cars. The legal implication is, that they will have and keep a safe track, and adopt suitable instruments and means with which to carry on their business. They can provide all this by the use of the requisite care or foresight; and if they fail to do so, they are guilty of a breach of duty, and are liable for the consequences. Of course, this obligation does not extend so far as to require them to provide against dangers which could not be reasonably foreseen; nor are they bound to secure the track against injuries which could not be anticipated by reasonable means, such as an unprecedented flood, or other unusual visitation. If a railway bridge is without fault as to plan, mode of construction, and character of materials, so that it was originally sufficient for all the purposes for which it was designed, and if the company sees that it is afterwards inspected, at intervals sufficiently short, by competent and skilled men, who exercise ordinary care and diligence to keep it in repair, the company has discharged its duty, and is not liable to an employé for an injury caused by a defect in such structure, unless it is shown that the company had notice of such defect, and, after such notice, failed to repair it."

Tested by the principles comprehensively and justly stated by the author quoted above, how can it be said that the railroad company, in this case, was derelict or negligent in the performance of any duty imposed upon it by law? Aside from the averments in the declaration, the record does not disclose a single circumstance or fact from which to draw the

conclusion that the bridge in question was in any respect defective in its mode of construction, or that the deceased, in the proper discharge of his duty as a fireman in the employment of said company, was subjected to any unreasonable risk and danger to his life or limbs; or that, in the proper discharge of his duty, he was, by reason of the manner in which the bridge was constructed, subjected to any risk whatever, other than what might and did result from his own want of proper care and caution, indeed from his own reckless exposure of his person in a position of imminent peril, and where his duty did not call him.

So far from there being any evidence that the bridge was defective in its mode of construction, the direct, positive, and uncontradicted testimony of the assistant division engineer, E. L. Crenshaw, is that the bridge is of the same width of all other bridges of a similar character along that line of railway, and is wider than some similar structures, and equal in width with others on other railroads, in this State, mentioned by him. And his direct and positive statement is, " That the bridge is properly built." This evidence is not in conflict with any evidence offered by the plaintiff, nor with any inference to be fairly drawn therefrom, and is, therefore, entitled to its full weight, even under the rule governing demurrers to evidence.

In view of the facts, as disclosed by the record, it is not possible, consistently with the very truth of the case, to arrive at the conclusion that the defendant in error is legally liable to answer in damages for the death of Thomas A. Sheeler, or that the defendant company did not, to the fullest extent, exercise the requisite care and foresight demanded by the legal implication that it would keep a safe track, and adopt suitable instruments and means with which to carry on its operations with safety to all who might lawfully be on its road, in the

exercise of ordinary care and caution, whether passengers or employees. The bridge was without fault as to plan and mode of construction; was amply sufficient for, and had for many years answered all the purposes for which it was constructed. In such case this court cannot undertake, in the absence of evidence, to say that the bridge was too narrow or was in any respect defective or unsuited to a well-constructed railway, or dangerous to either passengers or employees in the exercise of ordinary care and caution. To hold a railroad company liable, under such circumstances, on the ground of defective construction, would be to go far beyond the limits of judicial authority, and impose liability not imposed by law. There can be no presumption of negligence in a case like this.

In *N. & W. R. R. Co.* v. *Ferguson,* 79 Va. 248, Fauntleroy, J., says: "A carrier is not liable for injuries resulting from accident against which the highest degree of skill, foresight, and diligence would have been unavailing. The presumption of negligence, however, does not attach itself to every injury which may overtake a passenger while being transported in a car; it belongs only to that class of accidents which are caused by a defect in the road, cars, or machinery, or by want of diligence or care in those employed, or by some other thing which the company can and ought to control as a part of its duty to carry the passenger safely, because in all these matters it is the duty of the company to use the highest degree of care to have all their arrangements safe and in good condition." See also 20 American Railway Decisions, 245–7 and 261; *Meier* v. *Penn. R. R. Co.*, 64 Penn. St. 226, and other authorities cited by Fauntleroy, J.

The settled doctrine is, that " in order to maintain an action against a railroad company for injuries received, &c., it must be proved that the injury was caused by the negligence of the defendant, or his agents, and it must not appear from the evi-

dence that want of ordinary care and prudence on the part of the person injured, directly contributed to the injury." 17 Am. Railroad Rep. 253, and cases cited; and, also, Fauntleroy, J., in *Railroad* v. *Furguson, supra*. So, "when negligence is the gravamen of the action and no negligence is found on the part of the railroad company, or by any of its agents or employees, the law does not impute it; it lies on the party alleging it to prove it." *Richmond and Danville Railroad Company* v. *Anderson*, 31 Gratt. 812, and *N. and W. R. R. Co.* v. *Ferguson, supra*. In the application of these principles to the evidence, even as furnished by the plaintiff's own witnesses, it is clear beyond dispute that there is an utter absence of any evidence that the bridge, against which the plaintiff's intestate struck and was killed, was in any respect, negligently, or improperly constructed. So far from it, as we have seen, the direct and positive proof is that the bridge was properly built.

The case presented by the evidence is not only one in which the deceased did not observe the requisite care and caution, but is one in which he so recklessly exposed himself, in a position of extreme peril, as to make it absolutely certain that his own rash and thoughtless act was the *sole* proximate cause of his death. He was in a position where his duty did not call him, and into which he had not been ordered by anyone in authority. He was on the outside of the engine and tender, with his feet resting, one on the step of the engine, the other on the step of the tender; clasping with his right hand the hand-holder on the engine, and in his left hand the small hose, and, with his body swung out and stooping forward, with his left arm reaching round under the side of the engine, was engaged in the futile attempt to put out some burning waste on the box of the rear driving wheel of the engine, by squirting water from the hose through the spokes of the rapidly revolving wheel; the train at the time running at the rate of eighteen or twenty miles

an hour.   In this position he struck against the bridge side and was killed.   The evidence is clear and explicit, not only that the bridge was properly constructed, but that, had the bridge been twelve or even eighteen inches wider, the result would have been the same; and that, in his position, Sheeler could not have safely passed any similar structure or single-track tunnel on that line of railway.   Moreover, Sheeler took upon himself this desperate risk, after having passed this bridge, as brakeman and fireman, for over three years, and, on an average, once a day during that long period.   Hence, it is said : "If the servant, before he enters the service, knows, or if he afterwards discovers, or if, by the exercise of ordinary observation or reasonable skill and diligence in his department of service, he may discover, that the building, premises, machine, appliance, or fellow-servant in connection with which or with whom he is to labor is unsafe or unfit in any particular; and if, notwithstanding such knowledge, or means of knowledge, he voluntarily enters into or continues in the employment, without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master, in case it shall result in injury to him."   2 Thompson on Negligence, p. 1008.   And at p. 1509 the same author, with obvious propriety, says: "It may be stated, as a general proposition, that the master is under no lighter duty to provide for the safety of the servant than the servant is to provide for his own safety."

Thus Sheeler had the most ample opportunity of knowing, and, the necessary inference is, that he knew all about the danger to which he voluntarily exposed himself, and which resulted so fatally to him.   The evidence shows that his place, when the train was in motion, was inside the engine and tender; that no duty, under such circumstances, called him on the outside, but that he went on the outside, where, to a rational being, in

the exercise of ordinary foresight, no other result than that which followed could have been reasonably anticipated. Why did he thus rashly and thoughtlessly act? We think the facts and circumstances brought out in evidence sufficiently explain it. Sweetwood, the engineer, had sought and obtained the promise of promotion for Sheeler, and in this matter the latter most naturally felt a deep interest. He had, however, as we are bound to infer from the evidence, left his ash-pan open, and the live coals escaping had set on fire the waste on the box of the driving wheel. Conscious that the fire thus communicated was the result of his own carelessness and disobedience of orders, he hastily and without due reflection undertook the impossible thing of putting out the fire while the train was in motion, and thus to remove the evidence of his own careless neglect of duty in failing to keep his ash-pan closed, before it should be discovered. Thus impelled, he thoughtlessly put himself in the position of danger which resulted in his death. It cannot, therefore, be said that the accident resulted from the careless and negligent mode of constructing the bridge. The evidence establishes quite the contrary. We need pursue this branch of the case no further. Indeed, in respect to the mode of construction of the bridge in question, every demand upon the defendant in error here is met, and more than met, by the decision of this court in the case of *Clark's Adm'r* v. *R. & D. R. R. Co.*, 78 Va. 709. In that case the plaintiff's intestate, a brakeman on a freight train, whose duty required him to be on the top of the train while in motion, was struck by an overhead bridge, while at his post of duty, and killed. The bridge, like many others along that line of railway, was constructed so low that it was impossible for a man of ordinary stature to stand on the top of the train and pass safely under the bridge. The deceased had been but a short time in the employment of the company as brakeman, though he had pre-

viously been for some time employed in the company's yard at Manchester, shifting cars, making up trains, and the like; and at the time of entering into the company's service as brakeman, he was warned by the company's agent to look out for the overhead bridges, and his fellow-brakemen were instructed to show him the bridges, and to warn him of the dangers attending the same. He had passed the bridge at which he lost his life only three times, and each time in daylight; on the fourth trip at night he was killed, he having been warned at the last stopping before reaching the bridge to look out for same; and when nearing the bridge (standing), was called to by his fellow-brakeman, but he did not hear, or, if he did, failed to take the warning, and was struck and killed. It was insisted in that case that the defendant in error, the railroad company, was guilty of culpable negligence in so constructing the bridge that the plaintiff's intestate, in the discharge of his duty, could not safely pass under the bridge standing erect, and that the company had not duly notified him of the danger.

All the authorities were carefully reviewed by Lacy, J., who delivered the opinion in that case. In the course of his opinion that judge, quoting with approbation from the opinion of the court in *Owen* v. *The N. Y. Central Railroad Company*, said: "In view of the brakeman's knowledge as to the bridge, his omission to avoid the accident by stooping was such want of ordinary care and caution as would defeat his action if otherwise maintainable. Having assumed the risk of injury to his person from the bridge, evidence offered by him upon the trial tending to show its dangerous character was properly excluded. The danger was open and obvious, and within the plaintiff's personal knowledge at the time he entered the defendant's employment. It was a danger clearly incident to the service which he undertook to perform. He knew as well as his

employer the perils of the business, at least as respects the bridge in question, and the law will imply that he assumed the risk of personal injury;" citing *Sherman* v. *The Rochester & Syracuse R. R. Co.*, 17 N. Y. 173 , *Faulkner* v. *The Erie R. R. Co.*, 49 Barb. 324 ; 39 N. Y. 468.

Such being the doctrines applied to the case of a brakeman, whose duty required him to be on top of a freight train and frequently to pass, in an erect position, from one freight car to another, on a line of road where many overhead bridges were constructed too low to permit a man to pass safely under such structures without stooping or sitting down, and the brakeman, though the bridges had been pointed out to him, and he warned of the danger, had only passed the bridge three times, in day light, and was killed by coming in collision therewith on his fourth trip, at night, and where his contributory negligence consisted only in omitting to stoop or sit down, surely there can be no necessity for argument to show that there is no just ground to hold the railroad company liable in this case, when it clearly appears that the deceased, when killed, was voluntarily in a position where his duty did not call him when the train was in motion—the extreme peril of which position he was bound to know, as a rational being, with long experience and actual knowledge of the situation, and when, but for his own reckless act, he would not have been killed. There is, therefore, no just reason for saying that Sheeler met his death by reason of the company's negligent and defective mode of constructing the bridge. But it is insisted that, in violation of the rules of the company, the train was running at an excessive rate of speed; that such running was the negligence and careless act of Sweetwood, the engineer, who occupied to the deceased fireman the relation of vice-principal, and that the company is liable by reason of this act of negligence.

In the view taken of this case, it is wholly unnecessary to

decide the question whether the engineer occupied the relation of vice-principal, it being clear that no act of negligence is brought home either to the defendant or any of its agents.

The plaintiff in error relies upon certain printed rules of the company, found in the company's "Time Table No. 12," and especially upon Rule No. 106. These rules are so indefinitely referred to in the evidence as to make it uncertain to what extent and for what precise purpose they went in evidence to the jury. But, it seems, there was no objection in the court below to this evidence, and the fair presumption is, the gravamen of the charge being negligence, that the evidence was admitted as tending to prove the substance of the issue. But, however this may have been, it will be found on examination that these printed rules of the company, so far from fixing negligence upon the company, or its agents, actually exonerate it from the charge of negligence.

Conceding the train in question to have been a freight train— that Rule 106, relied on by the plaintiff in error, applied to the bridge in question, and seeing that that rule requires a freight train, when passing such structure, to reduce its speed to eight miles an hour, and it being proved that the train in passing this bridge, at the time of the accident, was running at the rate of eighteen or twenty miles—how can it be said, under the circumstances, that such rate of speed was negligence on the part of the engineer for which the company is liable? The printed rules are classified as train rules, general rules and rules for moving trains by telegraph. These printed rules are one hundred and seventy-two in number, and they constitute a very high testimonial to the wise foresight, prudence and caution of the company's management. The evidence shows that all the rules of the company are not printed, and in the nature of things they could not be, as unforeseen emergencies must frequently arise requiring special orders, as the occasion may

demand. This is illustrated by Rule 110, which requires conductors of trains falling behind time to report promptly by telegraph to the dispatcher, so that, if necessary, orders can be given to advance them; and by the same rule the speed of freight trains is limited to one mile in three and a half minutes, except in case of *special orders;* and by Rule 149, it is provided: "The division superintendents and train dispatchers, under their directions on their respective divisions, are the only persons authorized to move trains by telegraph. But one person shall be permitted to move trains by special order at the same time on any one section of the road."

On the occasion in question the train was running under a special "time order." A time order is an order permitting a train to run against or opposing a superior train; and a train so running, as shown by Rule 171, must clear the main track ten minutes before the time expires. Rule 172 requires conductors to show their orders to their rear brakemen, and engineers to show theirs to their firemen, so that all may fully understand their requirements. And Rule 165 requires both conductor and engineer to have a copy of such order, and to so handle their trains as to avoid the possibility of accident. In this instance, the train was running from Clifton Forge to Mason's tunnel under a "time order." The distance was over fifteen miles, which distance was required to be made in about fifty minutes, and the train to get out of the way ten minutes before the arrival of the express train at the latter place. Miller, the front brakeman, knew of the "time order," and the presumption is that the conductor had given a copy of the order to the engineer, and that the latter had shown it to the fireman, Sheeler, as required by Rule 172. This being so, the insistance of counsel for the plaintiff in error, that if the speed of the train had been reduced to eight miles an hour on approaching the bridge, that would have notified Sheeler to

withdraw from his position of danger, and that the accident would not have occurred, necessarily falls to the ground; because (1) the engineer did not know of Sheeler's position; and (2) Sheeler having knowledge not only of the situation of the bridge, but also of the "time order," had no right to expect any such notice, nor would he have needed any notice or been in any danger had he been at the time where his duty required him to be.   Moreover, the speed of the train was no greater than was necessary to reach Mason's tunnel by the time specified in the "time order," and but little in excess of the limit imposed, under ordinary circumstances, upon freight trains, of one mile in three and a half minutes.

As the train was running, not by ordinary or schedule regulations, but in obedience to a special order, to which Rule 106 could not apply, that rule, for the time being, was necessarily superseded by the special "time order."   The speed of the train was necessary to prevent a collision.   So important was this, that by reason of the short time lost in taking up Sheeler, the train had to hurry away and get on the siding at Crane's, some three or four miles short of the point specified in the time order.   Thus, an unforeseen emergency arose; the danger of collision was increased, and instead of rushing recklessly on to Mason's tunnel, the train stopped at Crane's. This was in strict compliance with Rule 118, which is in these words:   "*In all cases of doubt, take the safe course.*"   This brief but comprehensive rule but announces the fact, known to every person of observation and experience, that, in the conduct of the necessarily complex affairs, and especially in the management of the large number of trains constantly passing over a great line of railway, rules adopted to the ordinary state of things must, of necessity, be departed from, and life and property, in numerous instances, made to depend for the time upon the sagacity and fidelity of the agents and employees of com-

panies operating such railways. The law holds such companies to a rigid accountability for the loss of life, or for injury to the persons of all who may lawfully be on their roads, when such loss or injury is the result of the negligence and carelessness of the company or its agents. But when the death or injury to person results solely, as in this case, from the want of due care and caution on the part of the person killed or injured, there can be no recovery. In any view of the case, we are of opinion that the death of the plaintiff's intestate was the result of his exposure of his person to a danger not even incident to his service, for which the company was in nowise responsible; and that the judgment of the court below is plainly right, and must be affirmed.

JUDGMENT AFFIRMED.