𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

R. & D. R. R. Co. v. Risdon's Adm'r.

January 15th, 1891.

Absent—Richardson, J., and Hinton, J.

RAILROAD COMPANY AND EMPLOYEE—*Duties* —*Defective appliances*—*Contributory negligence*—*Case at bar*.—Employee accepts employment subject to incidental perils, and must obey orders. Employer does not insure employee's safety, yet must be .careful to provide and maintain safe machinery, &c.; but it is not required to exchange it for every supposed improvement. The "frog" in this case was dangerous, and could have been made safe by blocking. Yet it was a standard frog, the same used everywhere by the defendant company. The plaintiff's intestate had been for some time employed in same yard, over same frog, and was familiar with its character. On night of accident, yardmaster ordered him to uncouple cars, which were standing still, and then ride them back on a switch, but, instead of obeying orders,, he signalled engineer to back, and stepping between the moving cars to uncouple them, got his foot caught fast in the frog, and was run over and killed: *held*, employee's disobedience of orders was contributory negligence, and the proximate cause of the injury, and his administrator cannot recover.

Error to judgment of circuit court of Albemarle county, rendered October term, 1888, in an action on the case wherein F. S. Risdon, administratrix of F. P. Risdon, deceased, was plaintiff, and the Richmond and Danville Railroad Company was defendant. The object of the action was to recover damages for the alleged negligent killing of the plaintiff's intestate. The judgment being adverse to the said company, it

brought the case here on writ of error and *supersedeas*. Opinion states the case.

*C. M. Blackford*, for the plaintiff in error.

*D. Harman, Jr.*, and *V. W. Southall*, for the defendant in error.

Lacy, J., delivered the opinion of the court.

F. P. Risdon, an employee of the plaintiff in error company, was employed on the night of the 2d of March, 1888, in the company's yard at Charlottesville, in uncoupling cars. He had been employed as a yard-brakeman, and had had much experience as such. On the night in question a freight train arrived in the yard, and was at once put in charge of the yard-crew, consisting of the yard-master, Keys; the engineer of the yard, Coleman, who was in charge of the yard-engine; Butler, the fireman, and Risdon, a brakeman. Keys had charge of the crew, and gave orders for shifting the crew. He directed that two cars should be placed on the track on the east side of what is called a *three-throw* switch, which is fashioned according to the following diagram :

Opinion.

and two on the siding on the west side of the main track at this three-throw switch, and four were to be left on the main track. The night was dark; the yard engine was hitched by its pilot to the south end of the train, and had its front towards the north. Keys ordered the train to move south until it had cleared the switch (on the diagram marked "X") some seventy feet. He then so changed the switch that when the train backed it would run the train in on the right or eastern siding. He then walked south to where the train was standing, and got up on the south end of the second car from the rear and uncoupled it from the third, and gave the signal to the engineer to come back, and rode back on the top of the second car, holding the brake; and the engineer pushed the train upon the eastern or right siding, where the two cars were left standing, Keys having put down the brakes. Before leaving the switch Keys told Risdon that at this stage he was to change the switch, so as to throw the train on the left or west track, and then to uncouple two others, signal the engineer to come back, cut the two cars loose, and ride them in on the left or western siding. Risdon did change the switch, and, standing at his place at the switch, signalled the engineer to come back, which he did slowly, about four miles an hour, and as the train coming back passed Risdon, he ran in between the cars to uncouple them while in motion, stepped upon the middle frog, marked "5" in the diagram, got his foot caught fast, and was run over and killed, his shoe still sticking fast in the frog.

His administratrix sued the company and recovered damages on the first trial to the amount of $8,000, but this verdict the trial court set aside and awarded a new trial to the defendant company. At the second trial the verdict was for $7,250, and the court refused to set that aside, and rendered judgment in accordance therewith; whereupon the defendant applied for and obtained a writ of error to this court. All the evidence is certified, and, by virtue of the statute in this State (section

3484 of the Code of Virginia), the evidence must be con-
sidered according to the well-understood rule as to a demurrer
to evidence, so often stated here, and familiar to the profession.
*Richmond and Danville R. R. Co.* v. *Moore's Adm'r*, 78 Va., 96,
97, and cases cited.

Conceding that the frog in question was a dangerous frog—
that it was the only dangerous frog in the yard—and conced-
ing that this frog could have been rendered safe by blocking
it, still it is an established fact that the deceased had been
employed in this very yard, over this very frog, for some time
before, and that this frog was under his eyes at all times, just
as it was when his foot was caught in it. It is also true that
the evidence shows that this frog, like all other frogs used by
this company, was of the standard kind—was a standard frog.

If this deceased person was an employee of the defendant
company, and this dangerous frog was open and obvious, did
he not assume the risk incurred concerning it by being in the
company's employment. Nothing is better settled than that
the implied contract between the employer and the employee
is that the latter takes upon himself all the natural risks and
perils incident to the service. When a servant enters upon an
employment, he accepts the service subject to the risks inciden-
tal to it. An employee who contracts for the performance of
hazardous duties assumes such risks as are incident to their
discharge from causes open and obvious, the dangerous char-
acter of which causes he had opportunity to observe and as-
certain. If a man chooses to accept employment, or continue
in it, with the knowledge of the danger, he must abide the
consequences, so far as any claim against the employer is con-
cerned. *Clark's Adm'r* v. *R. & D. R. R. Co.*, 78 Va., 717.

It was the duty of the company to exercise all reasonable
care to provide and maintain safe, sound, and suitable ma-
chinery, road-way, structures, and instrumentalities; and it
must not expose its employees to risks beyond those which are
incident to the employment, and were in contemplation at the

time of the contract of service, and the employee has a right to presume that the company has discharged these duties. *O'Connell's Case,* 20 Md., 212; *Scally's Case,* 27 Md., 589; *Winder's Case,* 32 Md., 419; *Clark* v. *R. & D. R. R., supra; N. & W. R. R.* v. *Cottrell,* 83 Va. R., 519, and cited cases.

While this is true, however, the railroad company is not the insurer of the safety of the employees. Its duty to them is discharged by the exercise of ordinary care, and by ordinary care is meant such watchfulness, caution, and foresight as under all the circumstances of the particular service a corporation controlled by careful, prudent officers ought to exercise. Hence, it is not required to change its machinery in order to apply every new invention or supposed improvement in appliance, and it may even have in use a machine or appliance for its operation, shown to be less safe than another in use, without being liable to its employees for the non-adoption of the improvement, provided that the employee be not deceived as to the degree of danger which he incurs. *Darracott* v. *C. & O. R. R.,* 83 Va. R., p. 294.

The frog in question was of the standard sort, and it was such as this employee well understood, or might, with ordinary care, have well understood, because it was under his eyes in his daily work, not only here, but at every switch at which his duty called upon him to stand. A striking illustration of this is furnished by the late case of *Stewart's Adm'r* v. *N. N. & M. V. Co.,* reported in the Virginia Law Journal, Vol. XIV, 444, the coal-chute in that case being characterized as a man-trap, as this frog in this case has been. In that case the coal-pier was first class in construction in every respect, yet the chutes were not covered up. In this case the frog was a standard frog, but it was not blocked.

In the case of *Darracott* v. *C. & O. R. R. Co., supra,* p. 294, the duties of an employee are set forth, where it is said: "And he must inform himself, as far as he reasonably can, respecting the dangers as well as the duties incident to the service upon

which he enters. It has accordingly been held in numerous cases, and the principle is elementary, that where the employee's wilful disobedience of the company's rules is the proximate cause of the injury complained of, no recovery can be had of the company. And, in general, any negligence of the employee, amounting to the want of ordinary care, which is the proximate cause of the injury, will defeat an action against the company." See that case and the cases cited.

We do not think that the railroad company was guilty of any negligence in having this, a standard frog, at this and every other switch on its line, nor was it negligence in the company not to block up this frog. But this employee was clearly negligent in going between these moving cars, in the dark, to uncouple them. It was contrary to his orders, which were to uncouple and ride them in. He might have uncoupled them while standing, before he started them by his signal to the engineer to come back, or he might have suffered them to run in on the left siding at the three-throw switch, stopped them by a signal from his lantern, and then he could have uncoupled them while standing still on the siding. Either was perfectly safe, and one (the first) safe way was the one he was ordered to pursue; but either would have involved a walk in the dark of some little distance, which, although disagreeable, would have been safe, and he could have done this as easily as the yard-master, who did it that way a few ·minutes before, before his eyes. But he chose to disobey his orders and risk it, although hazardous, and ran in upon his perilous venture—perilous at night with or without the presence of a frog. In the dark he could not see where he stepped; a rolling stone, a small hole, a mis-step upon the side of a rail or cross-tie, or on anything casually there, would have made the undertaking dangerous; but here was a frog known to him to be dangerous, and which he knew was just where it was, and was obliged to be close to this switch, and yet, as the cars passed the switch, he ran in right over the frog, and was un-

fortunately caught and held by it, and met a horrible death, which all humanity must deplore. But was the result caused by any default or neglect of duty by the company? We think not. And was not his own inconsiderate rashness the proximate cause of the misfortune which befell him? We think it was. And it follows that he cannot recover damages against the company for his injury, which he brought upon himself.

It is clear that the circuit court erred in its judgment in refusing to set aside this verdict and grant the defendant a new trial, and the said judgment must be reversed and annulled.

Lewis, P., dissenting, said:

I dissent from the opinion of the court in this case. I am at a loss to see how, upon this record, such a conclusion could have been reached.

There were two verdicts for the plaintiff in the court below. The first was for $8,000, which was set aside; the second was for $7,250, upon which judgment was entered, and the evidence (not the facts) is certified. The case, therefore, comes before us as on a demurrer to evidence. Code, sec. 3484. So that the appellant must be considered as *admitting* all that the jury could reasonably infer from the plaintiff's evidence, and as *waiving* all its own evidence which contradicts the plaintiff's evidence, or the credit of which is impeached, and all inferences from its own evidence which do not *necessarily* flow from it. This important rule, now established by the statute in such cases, although recognized in the opinion of the court as applicable here, has, nevertheless, in the disposition of the case, as it seems to me, been utterly ignored, and the case dealt with as though we were sitting here to perform the ordinary functions of a jury.

There are but two questions in the case. The first is, whether the company was negligent; and secondly, whether the plain-

tiff's intestate was guilty of such contributory negligence as to defeat a recovery. Upon both of these questions two juries have found in favor of the plaintiff, and the last verdict was approved by the learned judge who presided at the trial, and saw the witnesses and heard them testify. It is under the latter verdict alone, that the defendant in error claims, and unless that verdict, when viewed in the light just mentioned, be *palpably* wrong, it is our duty to affirm it, according to the rule established by decisions of this court almost without number.

There is no dispute as to the law of the case. It is not contended that a railroad company is the insurer of the safety of of its employees, nor that it is bound to provide only the best and safest instrumentalities, nor that it is required to change its machinery in order to apply every new invention or supposed improvement in appliance. But it is contended, as both the supreme court of the United States and this court have repeatedly declared, that it must not expose its employees to perils or hazards against which they may be guarded by proper diligence on its part; or, in other words, that it is bound to exercise ordinary care not only in supplying, but in maintaining, suitable and safe instrumentalities, including a safe track. *Hough* v. *Railway Co.*, 100 U. S., 213; *B. & O. R. R. Co.* v. *McKenzie*, 81 Va., 71.

Now, whether or not this duty in the present case has been performed by the defendant was peculiarly a question for the jury; for, as was said by the court in *Carrington* v. *Ficklin's Ex'or*, 32 Gratt.. 670, what will amount to proof of negligence is necessarily a question of fact depending upon a great variety of circumstances which the law cannot define, and which must, therefore, be left to the jury upon the particular circumstances of each case. In the present case, the jury having found negligence on the part of the defendant, I do not see how, in the light of the rule applicable to a demurrer to evidence, and giving to the verdict the weight to which it is entitled, that find-

ing can be properly disturbed    R & D. R. R. Co. v. Medley, 75 Va., 499.

That the "frogs" were dangerous is not disputed. But it is contended that they were of the *standard* pattern, and that that fact of itself repels the imputation of negligence. From this view I dissent. If a standard frog, unguarded and situated, as this one was, in a place where there are many tracks, and where cars are shifted at all hours of the day and night, is not reasonably safe, then the company, in allowing it to remain unguarded, was guilty of negligence, and the jury rightly so found. Nor upon this point are we left to inference. The expert evidence for the plaintiff is conclusive that the dangerous condition of the frogs could easily have been guarded against by the device of "filling" them with cinders, which simple and inexpensive method, renders them safe to those whose duties call them upon the track, and at the same time does not interfere with their ordinary use. The witness, Perry, who for a number of years was in the employ of the defendant company as roadmaster, testifies that at terminal points, or in yards where much shifting is done, the frogs ought always to be filled, as a protection to switchmen, and this is so well understood, he says, that the laws of some States expressly require it to be done. And why should they not be filled? Why should the servant be exposed to unnecessary risks that can so easily be guarded against? Is the rule that the master must exercise reasonable or ordinary care a meaningless phrase —a mere jingle of words? I think not. As was decided by the supreme court in the *Hough Case*, it is the duty of the master not to expose the servant to perils or hazards against which he may be guarded by proper diligence on the part of the master. Or, in other words, to use the exact language of the court, the master is " bound to observe all the care which prudence and the exigencies of the situation require, in providing the servant with machinery or other instrumentalities adequately safe for use by the latter."

In that case the court cited a number of adjudged cases in support of its judgment, including an English case in the Exchequer Chamber, in which a recovery was sustained for injuries received by the servant in consequence of certain dangerous machinery being allowed to remain unfenced. And this court in the recent case of *S. W. Imp. Co.* v. *Smith's Adm'r*, 85 Va., 306, recognized the principle that while a railroad company is not an insurer of the safety of its employees, yet that it is bound to do all that human care and vigilance can reasonably do, consistently with the practical operation of the road, to put its road and other instrumentalities in safe condition, and to keep them so; and authorities to the same effect are very numerous.

In the present case "prudence and the exigencies of the situation" clearly required the defendant company, it seems to me, to fill the frogs in its yard, or otherwise to protect its servants against them, and the jury, therefore, rightly found, I think, that, in the absence of such precautions, its duty to the deceased had not been fulfilled.

The evidence shows moreover, that the particular frog which caused the death of the deceased was *different* from all the other frogs in the yard. It also appears that the difference was *explained to the jury*. But the explanation itself is not in the record. We must, therefore, infer that, in the judgment of the jury, the frog in question was more dangerous than the others, and that if the latter were adequately safe, it was not. This is, obviously, a most important point in the case, and as *all* the evidence upon which the jury acted is not copied into the record, the proper and necessary presumption is that the verdict, which was approved by the trial judge, is right. *McArter* v. *Grigsby*, 84 Va., 159; *Adams* v. *Hays*, 86 Id., 153.

That the present case widely differs from the *Clark Case*, which was the case of an overhead bridge, and from the *Darracott Case*, which was the case of a three-link coupling, is too plain for discussion. And the same remark applies with

greater force, if possible, to the *Stewart Case.* In the latter case the deceased, when killed, was not only a trespasser, but had been expressly warned against the dangers of the place where he recklessly walked to his death.

It is contended, however, that in the present case the deceased knew of the dangerous character of the frog in question, and that his own negligence was the proximate cause of his death. There is no proof that he was acquainted with the character of the frog, and, viewing the case in the light of a demurrer to evidence, the presumption is that he was not. The evidence is that at the time of his death he " was not regularly engaged in the yard," and that he was working that night in another man's place. Nor is there any proof that he ever saw the frog at all, or that he had any opportunity of seeing it. The night was dark, and it does not appear that his attention had been called to it. It is true he had been a brakeman in the yard before, but when, or how long, he was there does not appear. Nor was it proved that the frog was there at that time, and *non constat* it was not put there afterwards. Yet the statement in the opinion of the court that the frog "*was known to him to be dangerous,*" constitutes, in large measure, the basis for the reversal of the judgment. It was certainly not a necessary inference from the fact of his previous employment in the yard that the frog was there at the same time, and the burden of proving contributory negligence was on the defendant. *So West Imp. Co.* v. *Andrew,* 86 Va., 270.

Then, was it negligence on the part of the deceased to go in between the moving cars to uncouple them? The jury found that it was not; but the court is of opinion that it was. I think the jury were right.

There is no rule of the company forbidding its employees to uncouple cars while in motion (or, at least, no such rule was proven), and it was the constant and "notorious" habit of the men to do it. Keys, the yard-master, testifies that he did it

himself. It was proved, moreover, that it is not regarded, among railroad men of reasonable judgment, as dangerous or incautious to go between cars moving at the rate of three or four miles an hour to uncouple them, and it was only at the rate of four miles an hour that the train was moving when the deceased was killed. "I could do it," says Gay, a conductor in the defendant's employ, "*with perfect safety,*" and there is other evidence to the same effect.

But it is said that the deceased, in going in between the cars, violated the express orders of his superior officer, and hence assumed the risk of doing so. Upon this point, I am content to let the evidence speak for itself. The witness Keys, under whose charge the deceased was, testified that in executing the order given him to uncouple and side-track two of the cars, he (the deceased) "had four things to do, viz: (1), to throw the switch; (2), to signal the engineer back; (3), to cut the car loose; and (4), to get up on the car and bring it back," all of which things he had to do successively. It was also proved that it was the duty of the engineer to obey the signal, and it must be presumed, in the absence of evidence to the contrary, that he obeyed it promptly. Then to obey the order to cut the car loose and "ride it in," after signalling the engineer to move, the deceased was obliged to go in between the moving cars, as he did, and as "the universal custom" of switchmen in that yard was. And here it may be remarked that if this custom was universal and notorious, as the evidence shows it was, without any rule of the company against it, then the jury had a right to infer that it was followed with the acquiescence of the company.

It is true the same witness, in a subsequent part of his examination, says he told the deceased not to go in between the cars, and that he often told him not to go between moving cars. He says, however, the deceased was "not more venturesome than others," and it is fairly inferable, I think, that these orders were given in a general way, and on some other

occasion or occasions than the one in question. At all events, if such an order was given at that time, it was totally irreconcilable with the positive order above mentioned; for to have ordered the deceased to signal the train back, and then to uncouple and ride the car in, but not to go between the cars, would be very much like ordering one to swim, but not to go near the water.

It is very clear, I think, that there is nothing in the record to justify an appellate court in setting aside the verdict of the jury, and that the judgment of the circuit court ought to be affirmed.

JUDGMENT REVERSED.