# Richmond.

## SOUTHERN RAILWAY COMPANY v. JOHNSON'S ADMINISTRATRIX.

### November 17, 1910.

#### Absent, Cardwell, J.

1. MASTER AND SERVANT—*Rules—Habitual Violation—Estoppel—Burden of Proof.*—In order for a servant to claim a waiver of a known rule on the ground that it had been habitulaly violated, and thereby to estop the master from setting it up, the burden is upon the servant to establish three elements, all of which must concur: (1) The violations must have been so frequent as to become habitual; (2) The violations must have been known, or such as by the exercise of ordinary care should have been known to the master, or his vice principal, and (3) the master or his vice principal, being thus aware of habitual violations, must have taken no steps to secure and compel an observance. A servant cannot recover from the master when the injury complained of was due to his wilful violation of a regulation prescribed for his own safety.

2. RAILROADS—*Rules—Enforcement—Exceptions.*—Strict observance of rules regulating the movement of trains should be insisted upon by railroad companies, and courts will not impair the usefulness of such rules by engrafting upon them unnecessary limitations by way of exception or qualification.

Error to a judgment of the Circuit Court of Shenandoah county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Downing & Weaver* and *Robert B. Tunstall,* for the plaintiff in error.

*Walton & Walton* and *John M. Johnson,* for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

The judgment under review was recovered by the defendant in error (plaintiff below) for the alleged negligent killing of her intestate, Amon D. Johnson, in the following circumstances: Johnson was engineman on train 174, a through freight running from Harrisonburg to the Potomac Yards, near Alexandria, Virginia. At 12:35 o'clock in the afternoon of November 9, 1908, he was killed at Pugh's Run, a point one and one-half miles east of Woodstock, in a head-on collision with No. 263, a local freight train. The situation will be made plain by the following extract from the petition for a writ of error:

"In the operation of trains on the Harrisonburg or Manassas branch, the defendant installed at all telegraph stations what is known as the semaphore. This semaphore consists of two paddles, one being used for east-bound trains and the other for west-bound trains. These paddles are connected with and operated by the agent or operator at the various stations by means of levers, which are located in the latter's office. The normal position of these paddles is horizontal, and when in this position the signal shows red, indicating danger. Whenever a train approaches a telegraph station, the rules require the engineman to sound four short blasts of the whistle, which is a signal to the operator to lower the paddle from danger to proceed, in the event there are no orders held by him for that train. If, however, the operator has orders, the paddle remains at danger. As a station is approached, if the engineman fails to see the paddle fall or changed to proceed before coming to a stop, he is then positively forbidden to proceed or leave that station until he receives either a train order or a clearance card. This clear-

ance card is a written form, signed by the operator, addressed to the particular train, stating that he holds no orders for that train.    This card is delivered in duplicate, one of which the conductor hands to the engineman, the other being held by him, the card stating in large letters, 'Conductor and engineman must each have a copy and see that their train is correctly designated in the above form.'  Train orders are delivered by the operator to the conductor.   He receives two copies, one for himself and the other for the engineman, it being made the duty of the engineman to demand his copy from the conductor, since, in the movement of trains by orders and observance signals, the responsibility of the engineman, under the rules, is equal with that of the conductor."

At 11:40 A. M. an order was sent to the operator at Edinburg, a station six miles west of Woodstock, directing 174 to meet 263 at Woodstock. The same order was delivered to train 263 at Strasburg Junction, a station twelve miles east of Woodstock. Johnson's train arrived at Edinburg at 12:01, and the semaphore being set for danger he gave the required signal, but the paddle remained at danger which notified him that orders were held for the train, or that he should not proceed until he received an order or a clearance card. There was conflict in the testimony touching the delivery of the order to the conductor at Edinburg informing him that 174 was to meet 263 at Woodstock; but however that may have been, it is undisputed that Johnson, in flagrant violation of Rule 4, departed from Edinburg and proceeded on his journey without having received either an order or a clearance card.   The evidence also tends to show that when 174 approached Woodstock, both paddles of the semaphore were down, which under Rule 4 was an imperfect signal; and Rule 27 declares, that "A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a stop, and the fact reported to the super-

intendent." The evidence tends further to show that after remaining at Woodstock about two minutes, Johnson, in violation of the last mentioned rule, left that station at 12:29, and the collision occurred at 12:35.

To break the force of Johnson's disregard of these vital regulations, the plaintiff undertook to show that they had been so frequently violated by the employees of the defendant as to warrant the jury in believing that the superintendent and his assistants were advised of that condition and acquiesced in the non-observance of the rules. Accordingly the trial court, upon that theory and over the objection of the defendant, instructed the jury, "that it is the duty of a railroad company to adopt, promulgate and enforce proper rules for the guidance and control of its employees engaged in the hazardous duty incident to the moving and running of trains, and particularly to avoid collision between trains moving towards each other on the same track from opposite directions, and that the failure of said company in either one of the above particulars, that is to say the adoption, promulgation and enforcement of said rules, they may find the company negligent. And if they believe from the evidence that the said rules were frequently disregarded by the employees on defendant's trains with the knowledge or acquiescence on the part of those persons whose duty it was, under other rules of the company, to report the same to the superintendent's office, the jury may be warranted from such circumstances in imputing knowledge of the condition of affairs in this respect to the railroad company, or the want of ordinary care on its part in the performance of its duty if it remained in ignorance of a disregard of its rules as aforesaid."

The plaintiff, in support of the instruction, examined six railroad men as witnesses, three of whom—a conductor, an engineman and a brakeman—with an average experience of fourteen years each, testified that they had never violated the rule themselves, and had no knowledge of its having been

violated by other employees. Of the remaining three witnesses, Chapman, who had been station agent at Woodstock for twenty-seven years, testified that the rule had been in force generally throughout his entire term of service; that during that period, however, he had known the rule to be disregarded, but he could recall no particular instance of its violation. Yochum, a conductor, and Hawkins, an extra brakeman, also testified that they had known the rule to be violated. The plaintiff likewise proved the general rule of the company requiring employees to report all violations of rules to the superintendent or his assistant, who are charged with their enforcement.

The defendant then introduced the superintendent and assistant superintendents, whose terms of service covered a period of seven years, and proved that they had uniformly enforced observance of the rule, and that no single instance of its violation had been brought to their notice.

The imperative necessity for adherence to the policy of enforcing strict observance of the rules in question is obvious. Indeed, failure of duty either by railroad companies or their employees in a matter so essential to the protection of life and property would be little short of criminal. And the courts cannot be too careful to avoid impairing the usefulness of such rules by ingrafting upon them unnecessary limitations by way of exception or qualification.

In *Elmgren* v. *Chicago, etc., R. Co.*, 102 Minn. 41, 112 N. W. 1067, 12 L. R. A. (N. S.) 754, the court says: "It is of the utmost importance, as a matter of public policy, that the strict observance of these rules should be insisted upon by railroad companies, and, whenever opportunity occurs, by the courts. The appalling fatalities to human life and the great destruction of property consequent upon mismanagement and neglect of signal devices is in large measure avoidable. However much sympathy may be naturally felt for overworked employees, a rule of law which would ignore in any degree the safety

of the public would be little less than calamitous. If a clear case of violation of the solemn duty on the part of an employee to regard signals be shown, he must be held to be in no position, in the absence of a satisfactory explanation, to recover damages in a measure occasioned by his own fault."

In the *Wright* case it was shown that the rule there involved was uniformly and continuously disregarded, with the knowledge of the foreman of car repairs, whose duty it was to enforce it, and who took no action whatever in regard to its violation.

The correct principle deducible from the authorities with respect to waiver or suspension of a rule by way of estoppel from acquiescence may be stated as follows: "The burden is upon the plaintiff to establish three elements, all of which must concur: (1) The violations must have been so frequent as to become habitual; (2) The violations must have been known, or by the exercise of ordinary care should have been known, by the employee or employees charged with the duty of enforcing the rules involved; (3) The employee charged with the duty of enforcing the rules, being thus aware of its habitual violation, took no steps to secure and compel an observance." *Wright* v. *Southern Ry. Co.*, 101 Va. 36, 42 S. E. 913; *Driver* v. *Southern Ry. Co.* 103 Va. 650, 49 S. E. 1000, and *Lane Bros.* v. *Seakford*, 106 Va. 93, 55 S. E. 556, are in harmony with the great weight of authority on the subject and support the principle above enunciated.

In the *Driver* case (citing the former case with approval) the court says: "For it is settled law that an employee will not be absolved from the imputation of contributory negligence for violating a rule of the master, made for his own, as well as for the protection of others, because that rule is habitually disregarded, unless it appears (and the burden is on the plaintiff to show this) that it was done with the knowledge of the master, or he had so neglected to enforce it as that his conduct amounted to a suspension of the rule."

*Lane Bros. Co.* v. *Seakford, supra,* proclaims the general principle, that the master must exercise reasonable care to enforce proper rules adopted for the guidance and protection of his employees.

In Bailey's Personal Injuries, sec. 3367, it is said: "Evidence that employees of a railroad company were accustomed to act in violation of a rule is not admissible to establish a waiver of the rule, unless it be shown that a knowledge of the custom was known to the officers charged with the enforcement of the rule."

Again, at sec. 3372b, the learned author says: "In order to claim a waiver of a known rule by an employee on the ground that the rule had been habitually disregarded, and relieve him from the imputation of contributory negligence in failing to observe it, he must show that knowledge of such non-observance by the employees was brought home to the master. * * * *It makes no difference that other employees frequently or customarily disregarded the rule, unless the company, with knowledge of their practice, acquiesced in it in a way to sanction it, or practically to abrogate the rule; nothing would relieve the servant from abiding by his uniform orders."

In *Kansas City, etc. R. Co.* v. *Francis,* 110 Mo. 387, 19 S. W. 935, the court says: "It would be most unreasonable and unjust after imposing upon the master the duty of promulgating a rule for securing the safety of his servant, to permit the servant to recover from the master damages for injuries which the observance of the rule would have prevented. As the master is bound, at his peril, to make the rules, the servant should be equally bound at his peril to obey them. In such case the disaster is brought upon the servant by his own voluntary act, and he and not the master who has discharged his duty should bear the consequences. So it has been uniformly ruled."

This court has consistently recognized and adhered to the rule which denies recovery whenever the injury complained of was due to the servant's wilful violation of a regulation pre-

scribed for his own safety. *Sheeler* v. *C. &. O. Ry. Co.*, 81 Va. 188, 59 Am. Rep. 654; *Darracott* v. *C. & O. Ry. Co.*, 83 Va. 288, 2 S. E. 511, 5 Am. St.; *S. V. R. Co.* v. *Lucado*, 86 Va. 390, 10 S. E. 442; *R. & D. R. Co.* v. *Risdon*, 87 Va. 335, 12 S. E. 786; *N. & W. R. Co.* v. *Williams*, 89 Va. 165, 15 S. E. 522; *R. & D. R. Co.* v. *Pannill*, 89 Va. 552, 16 S. E. 748; *R. & D. R. Co.* v. *Dudley*, 90 Va. 304, 18 S. E. 274; *Driver* v. *Southern Ry. Co.*, supra; *Williams* v. *Norton Coal Co.*, 108 Va. 608, 62 S. E. 342. See also Labatt on Master & Servant, sec. 365, and note on "Disobedience of Rules" to *Bist* v. *London, &c. R. Co.*, 8 Am. & Eng. Ann. Cas., p. 3.

In the present case it is true there was some evidence of violations by employees of the defendant of the rules involved in instruction No. 1; yet direct knowledge of such infractions was not brought home to the superintendent or his assistants; nor did the evidence show the habit or custom of disregarding the rules to such extent that knowledge might be inferred therefrom. In these circumstances the trial court erred in giving instruction No. 1; and for that error the judgment must be reversed.

We have confined our observations to this single assignment of error, because it was the one chiefly pressed upon us in argument, and also because it presents the main reliance of the defendant in error to justify the recovery.

As the case must be remanded for a new trial along essentially different lines, we have purposely refrained from expressing any opinion on the weight of the evidence.

*Reversed.*