# Wytheville.

## SHUMAKER'S ADMINISTRATRIX V. ATLANTIC COAST LINE RAILROAD COMPANY.

### June 12, 1919.

1. PLEADING—*Declaration—Interstate or Intrastate Commerce.*—In an action for death by wrongful act by the administratrix of a servant against his master, the declaration alleged that the defendant was engaged in interstate and intrastate commerce, but it was not clear from the declaration as to whether or not the plaintiff's intestate was engaged in the one or the other at the time of the injury which resulted in his death. Defendant moved the court to require the plaintiff to elect whether she would proceed under the Federal or State statute on the subject.

   *Held:* That the defendant had no right to make any such demand. It had the right to require the plaintiff to state the facts in such a way as that the court could apply the appropriate statute.

2. PLEADING—*Matters of Law—Judicial Notice—Judicial Notice of Acts of Congress.*—It is never necessary to plead any matter of law of which the court will take judicial notice. It is the function of the pleading to state facts and not law. Our courts take judicial notice of the public acts of Congress as well as of those of the State, and will apply each as appropriate.

3. EMPLOYER'S LIABILITY—*State or Federal Statute.*—Whenever the acts of Congress relative to the liability of common carriers engaged in interstate commerce to their employees are applicable, they are exclusive, but if not applicable and the State statute is, the latter will be applied. No case can arise where both statutes are applicable.

4. EMPLOYER'S LIABILITY—*Jurisdiction of State and Federal Courts.*—In an action for the death of an employee, it was not clear from the declaration as to whether or not the intestate was engaged in interstate or intrastate commerce at the time of the injury which resulted in his death. The trial court, however, clearly had jurisdiction, under the Virginia statute, if the injury was inflicted upon the plaintiff while engaged in intrastate commerce, and the Federal statute also gave it jurisdic-

50

tion if the plaintiff's intestate was, at the time of the injury, engaged in interstate commerce, so that whether he was engaged in intrastate commerce or interstate commerce, the State court had jurisdiction. It was not necessary to mention in the declaration under which of the acts the plaintiff sued. It was sufficient if the facts alleged brought the cause of action within the terms of either statute.

5. EMPLOYER'S LIABILITY—*State or Federal Act—Advantage of Suing in State Court.*—It is often extremely difficult to determine whether the injured servant was engaged in interstate commerce or not, and the advantage of suing in the State court is that that court has jurisdiction under both acts, and if necessary facts are stated jurisdiction will be maintained under the appropriate statute, and the residue of the declaration, if necessary, will be treated as surplusage.

6. MASTER AND SERVANT—*Injury to Servant—Rules of Master—Danger Signals to Indicate that Employees are Repairing Cars or Engines—Case at Bar.*—The rule of a railroad company required that a blue flag by day and a blue light by night should be displayed at one or both ends of an engine, car or train to indicate that workmen are working under or about it. The rule provided that other cars must not be placed on the same track so as to intercept the view of the blue signal without first notifying the workmen. An engine was placed on a track and six or seven cars were then parked on the track at the rear of the engine, but not coupled to it.

*Held:* That it was the duty of a car repairer working on this engine to have placed the blue signal at the end of the cut of cars farthest on the track from his place of work, and not upon the rear of the tender of the engine. The rule above referred to declares that "other cars must not be placed on the same track so as to intercept the view of the blue flags," and the fair, if not necessary, inference is that, if cars are already on the track which would intercept the view, the flag must be so placed that the view of it will not be intercepted.

7. CONTRIBUTORY NEGLIGENCE—*Negligence Must be Established Before Questions of Contributory Negligence can Arise—Breach of Rule of Company as Proximate Cause—Case at Bar.*—Until the negligence of defendant is established, no question of contributory negligence of plaintiff can arise. Until the negligence of the defendant has been established, there is nothing to which negligence on the part of the plaintiff can contribute. It is essential, therefore, first to establish the negligence of the defendant. In the instant case, negligence of defendant was not established, as the failure of plaintiff's intestate to put up the blue flag for his protection, as required

by a rule of the railroad company, was the sole proximate cause of his death.

8. MASTER AND SERVANT—*Rules—Abandonment.*—Rules made for the protection of servants in dangerous employments and with which they are entirely familiar will not be held to have been abrogated or abandoned unless that conclusion is plainly warranted by the evidence and necessary for the protection of the servant.

9. MASTER AND SERVANT—*Rules—Abandonment—Case at Bar.*—In the instant case there was evidence that "light repairs" were often made at different places in the yard of the railroad company, sometimes with and sometimes without the use of the blue flag, which a rule of the company required for the protection of workmen while making repairs. There was no other evidence of an intention on the part of the company to relax the rule. On the contrary, although the deceased was an experienced workman and familiar with the dangers to which he was exposed, the foreman had called his attention to the flags and told him to be particular about their use.

*Held:* That there was no abandonment of the rule so far as the deceased was concerned.

Error to a judgment of the Law and Equity Court of city of Richmond in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*O'Flaherty, Fulton & Byrd,* for the plaintiff in error.

*E. P. Cox, Wm. B. McIlwaine* and *Mann & Townsend,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

The plaintiff sued to recover damages for the death of her intestate, occasioned, as she claims, by the wrongful act or neglect of the defendant. The defendant demurred to the evidence, and the trial court sustained the demurrer and

gave judgment for the defendant. To that judgment, this writ of error was awarded.

The declaration alleges that the defendant was engaged in interstate and intrastate commerce, but it is not clear from the declaration as to whether or not the plaintiff's intestate was engaged in the one or the other at the time of the injury which resulted in his death. At the calling of the case for hearing, the defendant moved the court to require the plaintiff to elect whether she would proceed under the Federal or State statute on the subject, and the record states, "and thereupon the plaintiff, not objecting to said motion, elected to have her declaration taken as stating a case under, and to try the case according to, the statutes and laws of Virginia and not under the acts of Congress of the United States relative to the liability of common carriers engaged in interstate commerce and the court directed the allegations in the declaration as to the fact of the defendant being a common carrier engaged in interstate commerce, as well as intrastate commerce, to be disregarded as surplusage."

[1-5] The defendant had no right to make any such demand. It had the right to require the plaintiff to state the facts in such a way as that the court could apply the appropriate statute. *St. Louis, etc., R. Co.* v. *Seale,* 229 U. S. 156, 33 Sup. Ct. 651, 57 L. Ed. 1129, Ann. Cas. 1914 C, 156. It is never necessary to plead any matter of law of which the court will take judicial notice. It is the function of the pleading to state facts and not law. Our courts take judicial notice of the public acts of Congress as well as those of the State, and will apply each as appropriate. Wherever the act of Congress is applicable it is exclusive, but if not applicable and the State statute is, the latter will be applied. *Vickery* v. *New London, etc., R. Co.,* 87 Conn. 634, 89 Atl. 277, 279; Second Employers' Liability Act, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44. No case

can arise where both statutes are applicable. *Troxell* v. *Delaware, etc., R. Co.*, 227 U. S. 434, 33 Sup. Ct. 274, 57 L. Ed. 586. The trial court, however, clearly had jurisdiction, under the Virginia statute, if the injury was inflicted upon the plaintiff while engaged in intrastate commerce, and the Federal statute also gave it jurisdiction if the plaintiff's intestate was, at the time of the injury, engaged in interstate commerce, so that whether he was engaged in intrastate commerce or interstate commerce, the State court had jurisdiction. It was not necessary to mention in the declaration under which of the acts the plaintiff sued. It was sufficient if the facts alleged brought the cause of action within the terms of either statute. *Vickery* v. *New London, etc., R. Co., supra; Missouri, etc., R. Co.* v. *Wulf,* 226 U. S. 570, 33 Sup. Ct. 135, 57 L. Ed. 355, Ann. Cas. 1914 B, 134. It is often extremely difficult to determine whether the injured servant was engaged in interstate commerce or not, and the advantage of suing in the State court is that that court has jurisdiction under both acts, and if the necessary facts are stated, jurisdiction will be maintained under the appropriate statute and the residue of the declaration, if necessary, will be treated as surplusage.

We do not wish to be understood as passing at present upon any question except that the defendant had no right to make the demand aforesaid of the plaintiff. Whether the injury complained of arose under the Federal statute or the State statute, and whether the declaration was sufficient under the Federal statute, and other questions need not be considered, as we are of opinion that the plaintiff was not entitled to recover under either statute.

After the plaintiff elected to proceed under the State statute no further question was made in the progress of the case as to which of the two statutes was applicable, nor was there any further suggestion that, under the facts of the case, the act of Congress was exclusive. Our further

consideration of the points raised has assumed that the injury arose under the State statute as seemed to be conceded by the defendant.

The plaintiff's intestate was employed by the defendant, at the time of his death, as an inspector and repairer of engines and cars brought into its yards at South Richmond, Va. He had been in the employment of the defendant company for fifteen years, and had worked in the capacity of repairer for ten or eleven years. He was fifty years of age, a man of experience in his work, familiar with the tracks in the yard on which he was killed and of their use, thoroughly acquainted with the methods of the work in the yard, and, as stated in the opinion of the learned trial judge, the conclusion is irresistible that "he was acquainted with the blue flag rule of the company, and was accustomed to act under it for his protection." There were a number of tracks on the yard, used chiefly for holding cars until they could be properly distributed and moved to other places to make up trains or to be otherwise disposed of. There were also two tracks, one long and the other short, designated as engine tracks, for holding engines, and one track known as a repair track, under which there was a pit, which was used for heavy repairs to engines. All of these tracks were connected with another track called the "ladder track." There were two hostlers on the yard in the daytime, and two at night. The dinner hour for the yard crews was from 11:30 to 12:30, at which time they turned their engines over to the hostler. The hostler cleans out the ash pan, coals and waters the engine, and if any repairs are needed he places it in any place where he is requested or directed to place it; but if no such request or direction is given, he places it wherever he chooses. He chocks it, and leaves it for the crew to take charge of after dinner. If only light repairs are to be made, and no direction or request is given as to the location, the hostler uses his own judgment as to where

to place it, as such repairs are made "most anywhere around."

[6] On Sunday, August 29, 1915, the crew in charge of yard engine No. 188 stopped for dinner about 12 o'clock and left the engine at the water column, near the round-house, and the hostler took charge of it, cleaned the ash pan, coaled and watered it, and then backed it in the north end of track No. 13, put a chock under it and left it. Six or seven cars were then parked on track No. 13, at the rear of the engine. The engineer went to the roundhouse to eat his dinner and, when about half through, the intestate came in, and a friendly conversation ensued, during which the intestate asked the engineer if there was anything he wanted done, and the engineer testifies "I told him no, it wasn't anything to do with the engine; it was alright except the lining of the air hose; it was loose, but the hose was not bursted, and I hadn't made a report. He says, 'Reckon I better put one on, hadn't I?' I says, 'Use your own pleasure about it, Mr. Shu., I haven't reported.' He turned around and went right off from me. I didn't know whether he had gone to put the hose on or not. He didn't come back into the roundhouse any more." The work to be done consisted of the removal of the old air hose and the attachment of the new, which would have required about five minutes time. The intestate got the new hose and his tools and went to track No. 13 to make the needed repairs. He used no blue flag to protect him while doing the work. He had about completed the job, when the cut of cars next to the tender on which he was placing the new hose was struck by cars pushed in by an engine at the south end of track No. 13, and he was pinioned between the drawheads of one of the cars and of the tender, causing the injury which resulted in his death. The testimony shows that the cars were not pushed in violently, but at the rate of about ten miles an hour, and that the stop signal was given and obeyed

just as the cars being pushed in on No. 13 track coupled to the cars standing on the track. The space between the cut of cars on track No. 13 and the tender of engine 188 was about five or six feet. Rule No. 26 of the defendant company is as follows: "A blue flag by day and a blue light by night, displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it, and, thus protected, it must not be coupled to or moved. Workmen will display the blue signals and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track so as to intercept the view of the blue signal without first notifying the workmen." Some question was made in the argument as to the proper place at which the blue flag should have been placed to have protected the intestate from collision with the cars to the south of engine 188 on which he was at work. It was insisted that under a proper construction of Rule 26, it should have been placed at the south end of the tender on which he was at work, but that it would have been wholly unavailing if placed there, as the view of it would have been cut off by the cut of cars on the track, and hence he was excused from the use of the blue flag altogether. We cannot accede to this, but on the contrary concur with the learned judge of the trial court, that the flag should have been placed at the south end of the cut of cars that was south of the tender. The engine was headed north, and back of it was the cut of six or seven cars. In order to protect himself from entries at the south end of track No. 13 he should have placed his flag on the south end of the car farthest south on that track from his place of work. The rule itself declares that "other cars must not be placed on the same track so as to intercept the view of the blue flag," and the fair, if not necessary, inference is that if cars are already on the track which would intercept the view, the flag must be so placed that the view of it will not be intercepted. This is the fair and

reasonable interpretation of the rule, and accords with the practical interpretation thereof as testified to by the yardmaster and engineer in this case.

[7] The question of contributory negligence was argued at length before us, and also the effect of the recent statute of this State relating to contributory negligence in cases of this kind, but in our view of the case no question of contributory negligence is involved, as that question can only arise after the negligence of the defendant has been first established. Until the negligence of the defendant has been established, there is nothing to which negligence on the part of the plaintiff can contribute. It is essential, therefore, first to establish the negligence of the defendant. In the case at bar we are of opinion that negligence on the part of the defendant has not been established; that the failure of the plaintiff's intestate to put up the blue flag for his protection was the sole proximate cause of his unfortunate death. These flags were provided in great abundance and at a most accessible place, but were not used by the intestate. No one knew that engine 188 was to be repaired at this time—it was not placed in position for that purpose—and no one knew or was chargeable with knowledge of the fact that the plaintiff's intestate was engaged in making repairs thereon. He gave no information of his purpose to any one operating on the yard, and failed to adopt the means furnished by the company for his protection. He took his chances and lost. He assumed the risk. It would be a vain thing to require the master to make and publish rules for the safety of his servants if the latter may violate them with impunity. It is as imperative that the servant should obey the rules as it is that the master should make and publish them. Neither can violate his duty in this regard without suffering the consequences. *Norfolk & W. R. Co.* v. *Cofer,* 114 Va. 434, 76 S. E. 909; *Ches. & O. R. Co.* v. *Parker's Adm'r,* 116 Va. 368, 82 S. E. 183; *Va. I. C. &*

*C. Co.* v. *Asbury's Adm'r,* 117 Va. 683, 86 S. E. 148, and cases cited.

[8, 9] It appears from the evidence that "light repairs" were often made at different places in the yard, sometimes with and sometimes without the use of the blue flag, and it is argued from this that Rule 26 was abandoned, but there is no other evidence of an intention on the part of the company to relax the rule. Indeed, although the deceased was an experienced workman and familiar with the dangers to which he was exposed, the roundhouse foreman "called his attention to the blue flags and told him to be particular about the blue flags and always use them." There was certainly no abandonment of the rule so far as he was concerned. Rules made for the protection of servants in dangerous employments and with which they are entirely familiar will not be held to have been abrogated or abandoned unless that conclusion is plainly warranted by the evidence and necessary for the protection of the servant. Compare *Southern R. Co.* v. *Johnson's Adm'x,* 111 Va. 499, 69 S. E. 323, Ann. Cas. 1912 A, 81.

In view of our conclusions that the failure of the plaintiff's intestate to put up the blue flags at proper places was the sole proximate cause of his death, it is unnecessary to consider other questions discussed in the oral arguments and in the briefs. For the reasons hereinbefore stated, the judgment of the Law and Equity Court of the city of Richmond will be affirmed.

*Affirmed.*

SIMS, J., dissenting:

1. This case impresses me as one in which the concurring negligence of the plaintiff and defendant was the proximate cause of the injury and death complained of. Prior to the Federal employers' liability act (act Cong. April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. §§8657-8665]) and the

statute of Virginia of 1916 (presently more particularly cited) on the subject, there could be, as is well settled, no recovery by the plaintiff in such a case. But the rule is equally well settled that the plaintiff is entitled under such statutes to recover some damages in such a case.

This case, without objection on the part of the defendant, was tried as having arisen under the recent statute in Virginia aforesaid (4 Pollard's Code, p. 1207), which abolishes the defense of contributory negligence as a complete bar in suits of their employees against common carriers. This statute, so far as material, provides as follows:

"The fact that such employee may have been guilty of contributory negligence shall not bar recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

The statute is the same, in substance, on the subject of contributory negligence as the employers' liability act of Congress on that subject, and must be liberally construed in favor of the employee. *U. S.* v. *Southern Ry. Co.* (D. C.), 170 Fed. 1014; *Gray* v. *Louisville & N. R. R. Co.* (D. C.), 197 Fed. 876; *N. & W. Ry. Co.* v. *Earnest*, 229 U. S. 114, 33 Sup. Ct. 654, 57 L. Ed. 1096, Ann. Cas. 1914 C, 172.

It is well settled that under such a statute "contributory negligence is available only in reduction of damages, and not as a defense." *McDonald* v. *Railway Transfer Co.*, 121 Minn. 273, 141 N. W. 177. "Contributory negligence, to be a bar to recovery, must be the sole cause of the injury." *Delano* v. *Roberts* (Mo. App. 1916), 182 S. W. 771. "No degree of negligence on the part of a servant injured by the negligence of the carrier, however gross or proximate as a matter of law, can bar a recovery." *Penn. Co.* v. *Cole* (1914), 131 C. C. A. 244, 214 Fed. 948. "A railroad company is liable when through employees it is guilty of any causative negligence causing injury to an employee, no matter how slight the negligence in comparison to the negli-

gence of the injured employee." *N. Y. C., etc., R. Co.* v. *Niebel* (1914), 131 C. C. A. 248, 214 Fed. 952.

If my impression of the facts of the case is correct, the jury were warranted in finding from the evidence that the defendant was guilty of some actionable negligence, and we, on demurrer to the evidence, must also so find. Hence, if the plaintiff's intestate were regarded as also guilty of negligence in failing to use the flags, even if there was a rule requiring him so to do, that would not bar the plaintiff from all recovery.

2. On the subject of whether the defendant was guilty of any actionable negligence:

Considering the evidence in the case under the statutory rule applicable thereto (there having been a demurrer by the defendant railroad company to the evidence), I find myself unable to avoid the conclusion that the railroad company cannot shield itself from the imputation of negligence in the instant case by relying on a violation by the plaintiff's intestate of any rule of the company. See *Wright's Adm'x* v. *Southern Ry. Co.*, 101 Va. 36, 42 S. E. 913.

Rule 26, relied on by defendant, requiring engine or car repairers to display blue flags by day "at one or both ends of an engine, car or train," to indicate "that workmen are under or about it," does not cover the situation which arose in the instant case. The rule, as appears from the whole of the rule itself, has reference to a situation where repair work is being done on an engine, car or one of a train of cars, located on a track on which there are no other cars at the time the repair work commences, so placed as to intercept the view of the blue signal. It does not cover the situation of repair work done on an engine located at, and before the repair work is begun, anywhere on the yard on a track on which there are other cars at the time of the beginning of such work which would intercept the view of the blue signal. The latter was the situation which arose in

the instant case—and the testimony for the plaintiff is to the effect that when repair work was done on the yard, as in the instant case, when other cars were on the same track, the rule aforesaid was not observed and was not expected to be observed. That in such cases the blue flags were not expected to be displayed in accordance with said rule "at one or both ends of an engine, car or train" to indicate "that workmen were under or about it;" nor were they looked for or expected before the cars were signaled to be and were switched on the track where the engine was located on which the plaintiff's intestate was at work at the time he was killed. To meet such a situation, the defendant relies on testimony tending to show *a custom* for engine and car repairers to display the blue flags, *not* "at one or both ends of the engine, car or train" on which work is being done, but at the end of the engine or car nearest the switch outlet end of the track which may stand between such track-end and the place of such work. This, plainly, was not a rule, but a custom adopted to supply the lack of a rule fitted to meet such situation. It shows in a most convincing way that the defendant did not discharge its duty to make a rule covering such situation, but left its employees affected to work out for themselves some method of safeguard of themselves in such situation. But the further vital fact disclosed by the evidence is that such custom of such employees was, if not "more," *at least* as much "honored in the breach (as) in the observance," and this, as the evidence further discloses, was, long before the accident in the instant case, well known to the vice-principal of the defendant, its yardmaster, and hence must be held to have been thus well known to the defendant.

And the situation aforesaid for which the rule aforesaid made no provision was in no way unusual. It was in fact a continually recurring one, according to the testimony for plaintiff and some of the testimony for defendant—where

the repairs to be made to engines or cars were not of an extensive nature, and were such as the repair made in the instant case (which was the putting on of a new hose-coupling, requiring only about five minutes' work)—and were made not on a repair track, but anywhere on the yard.

And there is no denial on the part of the witnesses for defendant that it knew all along of such custom being both ways. And the most that can be said of the evidence for plaintiff in a favorable way for the defendant is that there is testimony that the defendant admonished the plaintiff's intestate that he was taking a risk at the times at which he was seen not making use of the blue signals for his protection (a much milder effort toward enforcing any rule on the subject than was adopted by the railroad company in the *Wright Case,* aforesaid)—and precisely in what situation such neglect to use such signals occurred does not appear from the evidence  But no other effort whatever seems to have been made by defendant to enforce the use of such signals in any situation of the car or engine repairers; and certainly none in the situation like that which arose in the instant case. As aforesaid, not even was there an adoption by defendant of a rule on the subject. Hence the first step towards the exercise of reasonable care to *enforce* such a rule was never taken by the defendant. The instant case seems, therefore, to be stronger for plaintiff than that of the *Wright Case* aforesaid (101 Va. 36, 42 S. E. 913).

And had the rule relied on in the instant case covered the situation aforesaid, there is no evidence in the case that it was ever promulgated or made known to the plaintiff's intestate. On demurrer to the evidence, no inference can be properly drawn that it was. Further, there was the "disregard of such rule with the acquiescence of the company, or neglect to enforce it, shown by the testimony for the plaintiff and by the inference in that behalf which the jury were warranted in drawing. The plaintiff's witnesses on this

subject were themselves the employees of the defendant and they were not cross-examined and in no other way was an attempt made by the defendant to show any serious effort made to enforce the use of the signals aforesaid in like situations as that which arose in the instant case. So far as appears from the record, the yardmasters made no effort whatever to enforce any such rule, although they knew, as aforesaid, that it was not being observed. If there was ever any rule promulgated, it must, therefore, under the authority of the *Wright Case,* aforesaid, be considered as having been suspended.

And the same is true under the authority of *Southern Ry. Co.* v. *Johnson's Adm'x,* 111 Va. 499, 69 S. E. 323, Ann. Cas. 1912 A, 81, as the non-observance of the rule was habitual, was actually or constructively known to defendant, and no real effort was made by defendant to enforce any such rule. Nor is the instant case such a case as that of *N. & W. Ry. Co.* v. *Cofer,* 114 Va. 434, 76 S. E. 909, where the plaintiff admitted that he had read the blue flag rule which was posted and repeatedly given to him, and where the evidence failed to show an habitual non-observance of it with the acquiescence of the railroad company, the contrary being true in the instant case as must be inferred on the demurrer to evidence.

The correctness of the foregoing conclusions will be made more apparent by the consideration of the extracts from and reference to some of the testimony in the record, which are set forth below.

The following extracts are from the testimony of the yardmaster of the defendant, examined as a witness for the plaintiff, where he testifies concerning his knowledge that slight repairs were made on engines wherever they might be on the yard, as to the custom of use and non-use of the blue flags, and concerning the very occurrence of the switching of the cars on the track No. 13 against the engine

on which the plaintiff's intestate was at work and which caused his death:

"A. * * *. when light repairs are made, I have known them to do light repairs most anywhere around.

    \*        \*        \* .        \*        \*

"Q. When they were doing light repairs, I want you to tell the jury if it was the custom, or if the men working on those cars always ·put out flags, whenever they have light . repairs?

"A. Not always, no sir.

"Q. You said a while ago, in answer to a question by counsel on the other side, that you had seen flags put up and flags not put up, protecting and not protecting by flags, and when they did light repairs they frequently didn't put up flags?

"A. Don't understand me to say they never did it, but they do sometimes make repairs, as I have said, light repairs.

"Q. And that was the custom?

"A. Yes, sir.

"Mr. Mann: What was the custom? What are you talking about?

"Mr. Fulton: To do light repairs without a flag.

"Mr. Mann: I think that is what you said. The witness hasn't said it.

"By Mr. Fulton:

"Q. Didn't you state it?

"A. I said it had been done sometimes without a flag.

"Mr. Mann: What you asked was what he said. You undertook to make it refer to his last answer.

"Mr. Fulton: No, I did not.

"Mr. O'Flaherty: Both ways, he said.

"By Mr. Fulton:

"Q. They did in both ways. Isn't that what you told the jury, Mr. Pollard?

"A. I said that I had seen them on several occasions do light repairs without a flag."

This witness, the yardmaster, was present and by signal directed the putting in of the very cars on the track No. 13, which moved the engine and caused the injury and death of plaintiff's intestate, as aforesaid. Concerning this occurrence, he testifies as follows:

"A. I did see the engine * * * just about the time he made the coupling.

"Q. About the time he made the coupling to what?

"A. To the cars attached to the engine on the south end; when he shoved in and coupled to the cars standing on No. 13.

"Q. You saw the engine on the north end?

"A. I saw the other engine on the north end. I told the conductor that there was an engine on the other end, better not shove down.

"Q. And your conductor shoved down, notwithstanding—

"A. No, sir; that he didn't. We had given him a stop signal.

* * * * *

"Q. He got down far enough to kill the man, didn't he?

"A. Doesn't take very much to kill one in between box cars and an engine.

* * * * *

"Q. As a matter of fact, those cars were shoved down, weren't they, that were on that track?

"A. They were evidently moved or else no damage would have been done Mr. Shumaker.

"Q. When you saw that engine, why didn't you tell him not to shove down?

"A. For fear we would shove this engine on the ladder (track) on the north end of the yard.

"Q. He didn't get that signal in time enough to prevent his shoving the cars down?

"A. He didn't shove the cars down. The slack of the cars rolled down * * * when he shoved in and struck these cars. Naturally there is a certain amount of slack in these cars, and when they come up like that * * * you stop and it runs out. * * * what killed Mr. Shumaker—the slack—there is a certain amount of slack in cars. If you shove them all up together and stop your engine they are bound to stretch out.

\* \* \* \* \*

"Q. Couldn't you have seen if you had looked before that?

"A. I suppose I could have.

\* \* \* \* \*

"Q. You saw it down there and these engines likely to be repaired at any time; you could think it was likely to be repaired?

"Mr. Mann: I object to any such question as that.

"The Court: That is rather a statement than a question.

"By Mr. O'Flaherty:

"Q. I ask you wasn't that a fair assumption, that they would be likely to be put down there for repairs?

"Mr. Mann: I object to any such question as that.

"The Court: You can ask him whether it was out of the ordinary to see an engine at that hour of the day standing there.

"Mr. O'Flaherty: For repairs.

"The Court: For repairs or otherwise.

"Mr. O'Flaherty: What about it, Mr. Pollard?

"Witness: Shall I answer that?

"By the Court: Was it out of the ordinary for an engine that time of day to be standing on that track?

"A. No, sir. You see, then they are congested; say you have fifteen or twenty engines there, they drop an engine over there out of the way any time during meal-hour for a short space of time.

\*     \*     \*     \*     . \* ⁻

"By Mr. Mann:

"Q. I will ask you, was there anything there at all, Mr. Pollard, to indicate to your mind that by any possibility that engine was at the time being repaired?

"A. No, sir; nothing to indicate it."

And Mr. Vaiden, the roundhouse foreman, a witness for defendant, testified that he never gave the plaintiff's intestate the book of rules and never gave him any instructions as to the use of the flags, as the latter was in the employment of the defendant before the witness became his foreman, and witness inferred he knew the rule was in existence. This witness does testify that he had seen the plaintiff's intestate doing repairs on the yard when "sometimes he would have a flag up and sometimes he wouldn't," and that at the times witness saw the plaintiff's intestate working without the protection of the flags he "\*   \*   \* called his attention to the blue flags and told him to be particular about the blue flags and always use them." This is all the evidence I have been able to find in the record of any effort to enforce such a rule or make the actual method of conduct of defendant's business depend upon the observances of such rule.

This witness further testified as follows:

"A. Yes, I have seen them make small repairs out there without the flag.

"Q. Where have you seen them do it—at what points?

"A. They very often do it around the shop there.

"Q. Well, how about in the yard? You say they very often did around the shop?

"A. Yes, sir.

"Q. Did they very often do it on the yard?

"A. Well, yes; I have seen them do it on the yards?

"Q. Then, it is nothing new to repair an engine with these

small repairs without putting up a flag, according to what you say, is that true?

"A. That is right."

\*       \*       \*       \*       \*

3. The case is one in which it is apparent from the evidence, when considered on demurrer, that the railroad company did not itself rely on the use of flags by engine repairers or car repairers to give to it notice of their position of danger, certainly when only slight repairs were being made, as in the instant case; or on an engine being on any particular track or place on the yard when such repairs were to be made; nor on any notice having been communicated by the repair workmen or any other person to the hostler or to the yardmaster or to the train crews engaged in shifting cars on the yard that such repairs had to be made or were being made.

The repair work report sheet in the roundhouse served merely to record orders for repairs addressed to the engine or car repairers, and were not in practice communicated to the yardmaster or train crews engaged in shifting cars on the yard. The existence or non-existence of entries on such report of orders for repairs performed absolutely no function in notifying the yardmaster or train crew aforesaid when to expect to. find repair work being done on the yard. As the record shows, under the system under which the defendant railroad company conducted its business, its yardmaster and shifting car crews, by the exercise of ordinary forethought, would have foreseen and known that wherever an engine was standing on the yard they might as often find light repair work being done on it without any flags displayed as with such flag display; and if such an engine were moved by shifting cars against it, it was likely or reasonably possible that an engine repairer would be at work upon it and might be injured.

Hence, under such a system of conduct of its business, I think it was the duty of the defendant, through its yard-master and shifting car train crews, to use reasonable care to look out for the position of engines standing on its yard, and the same care not to move such an engine by shifting cars on the track against it without previous examination to see if a repairer was at work upon it, or without warning to such repairer.

That such likelihood of injury to engine repairers was ever present was foreseeable by the exercise of reasonable forethought, and that such duty to guard against such injury existed seems plain under the facts of this case. That the jury were warranted in reaching the conclusion that both existed, appears from the above extracts from the testimony of the yardmaster of the defendant and from the testimony of the roundhouse foreman of the defendant above referred to and quoted from, and from other evidence in the record.

Notwithstanding certain positions taken by said witnesses, as shown from their testimony above given, it was a question for the jury whether the yardmaster would have anticipated that it was likely or reasonably possible that light repairs were being made on the engine as it stood on track No. 13, if he had exercised reasonable forethought under all the circumstances known to him, or which would have been known to him by the exercise of reasonable care in the premises. And this is especially true in view of the testimony for plaintiff of George Stark, a switchman, to the effect that the hose was so broken that it could not be used longer and had to be repaired during the dinner hour, according to the way in which defendant's business was conducted, and the further fact that the yardmaster was with this very engine in the forenoon (about 10:15 A. M.) and then saw and knew that the engine needed the very repairs which the plaintiff's intestate was later engaged

in making when he was killed. At that time, as the record shows, the yardmaster noticed the broken hose and remarked "that the lining of the air hose was loose." Moreover, he states himself in his testimony, that he had been with this engine not long before the dinner hour. In fact, he says in his testimony that he was aware of where the engine was all the morning until the dinner hour, and he saw it "going to the roundhouse" at the dinner hour. He therefore had an especial reason to foresee the likelihood, or the reasonable possibility, of the engine being repaired during the dinner hour, and the jury might well have concluded that he would have so foreseen if he had exercised reasonable thought about the matter. And the jury might well also have concluded that the yardmaster and his principal, the defendant, acting through him as its vice-principal at the time, were guilty of culpable negligence in giving no further thought or concern as to the whereabouts of the engine until he afterwards *first signaled* for the cars to be shoved on the same track on which the engine was, and where he admits he might have reasonably expected it to have been, and *then* looked down the track, seeing the engine too late for his stop signal to prevent its being moved —instead of exercising reasonable forethought in the premises and *looking first* down the track for the whereabouts of the engine before taking the action aforesaid.

4. The testimony of the engineer of the defendant, in charge of the engine, quoted in the majority opinion which attempts to make a case of a volunteer of the plaintiff's intestate—of uncalled-for action on his part in undertaking the repair of the engine—must be disregarded on demurrer to the evidence; the testimony of the switchman, George Clark, is in direct conflict with the engineman's testimony on the subject of the need of repairs to the hose, and Clark's testimony and the testimony of Johnson, a witness for plaintiff, on the same subject, must be taken in its

stead. The foreman testified, as above indicated, and the latter testified, in substance, that he was sitting near-by when the engineman, Mr. Blunt, was talking with the plaintiff's intestate at the roundhouse during the dinner hour about the engine aforesaid, and that the witness understood from what Blunt said that "a hose had to go on the engine" —"that the hose on his engine was out of order," and that the plaintiff's intestate said: "* * * I will put it on," and that the latter thereupon departed as if to do such work, and was engaged in that very work when he was killed. This witness also testifies, in substance, that, in the usual course of the defendant's business, as it was conducted, such verbal request of an engineman for repairs to an engine made it the duty of a repairer (such as was the plaintiff's intestate) to immediately go and make the repairs.

For the foregoing reasons, I am constrained to dissent from the majority opinion of the court.