**NORFOLK & W. RY. CO. et al. v. HALL.**
No. 3030.

Circuit Court of Appeals, Fourth Circuit.
April 25, 1931.

NORTHCOTT, Circuit Judge, dissenting.

A. W. Reynolds, of Princeton, W. Va., and Joseph M. Sanders, of Bluefield, W. Va. (Bernard McClaugherty and Sanders, Crockett, Fox & Sanders, all of Bluefield, W. Va., and Albert W. Reynolds, Jr., of Princeton, W. Va., on the brief), for appellants.

A. J. Lubliner and John Kee, both of Bluefield, W. Va., for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge.

George W. Hall brought an action at law in the circuit court of Mercer county, W. Va., against the Norfolk & Western Railway Company, a corporation, and American Railway Express Company, a corporation, for personal injuries received by him on board a mail car of the railway company in the state of Virginia on December 14, 1927. The suit was removed from the state court to the District Court of the United States for the Southern District of West Virginia. The plaintiff was an employee of the express company, but on this occasion had been furnished to the railway company, which set him to work in the transportation of the United States mail under an arrangement between the railway company and the United States government. The plaintiff was injured by a heavy iron stanchion which was part of the equipment of the car, and which fell en route, striking him on the head and inflicting a fracture of the skull. The jury found a verdict for the plaintiff in the sum of $18,500 against both defendants, and from the judgment based thereon, the appeal in this case was taken.

The mail car was new and was making its first trip on a regular run from Cincinnati, Ohio, to Norfolk, Va. It was equipped with upright stanchions placed at intervals in two lines which ran lengthwise parallel to the sides of the car. There was an aisle between the two rows of stanchions and likewise a space between each row of stanchions and the side of the car next to it. The stanchions were made of 1½″ steel pipe, 20 pounds in weight, and were of two heights 7′5⅜″ and 7′8 1/16″ respectively. There were 34 stanchions in all. They were of use in the separation of the mails for various points of destination. When in use the stanchions stood in a perpendicular position, the lower ends resting in slots in the floor of the car, and the upper ends being permanently fastened by swivel joints to the ends of steel brackets which extended inwardly from the sides of the car. The swivel joints allowed the stanchions, when lifted out of the slots in the floor, to be moved in any direction for the convenient handling of the mail. When not in use, the stanchions were laid in a horizontal position near the top of the car, and when so disposed, were supported at one end by the swivel joints, and at the other, by hooks suspended from the roof of the car or by grooves on top of the brackets from which the swivel joints were suspended. The hooks and grooves were not provided with safety catches or locks, but the shape of the hooks and of certain ledges in the ends of the brackets were designed to prevent the stanchions from falling out of the receptacles upon the floor of the car. It will be thus seen that the number of receptacles in which the lower ends of the stanchions could be placed exceeded the number of stanchions. There were in fact 54 hooks and grooves in the brackets, and in addition it was physically possible to place the ends of the stanchions on the brackets outside of the grooves.

The difference between the arrangement of stanchions in the new car above described and that in the cars previously in use, with which the plaintiff had had two years' experience, was that in the latter the stanchions were detachable at both ends. When in use, they fitted in grooves at the top of the car and in slots in the floor. When they were not in use, they were separated at both ends and laid out of the way in racks or placed against the walls of the car.

The car in question was loaded with mail at Cincinnati on the evening of the day before the plaintiff's injury, and was brought thence, without change of contents, to Bluefield, W. Va., where it arrived on the morning of December 14. The car was solidly packed with mail at Cincinnati from the rear end of it to the two forward side doors, with the exception of a small passage across the car at these doors. There was no passage or aisle running longitudinally through the center of the car. The load extended from the floor nearly up to the bottom of the swivel joints. At each end of the mail, the stanchions were in the sockets in the floor, but the stanchions in between were resting in the receptacles overhead. The employees who loaded the car at Cincinnati testified that the stanchions detached from the floor were properly placed in the receptacles before the mail was packed in the car beneath them; but that after the car had been loaded, the stanchions were not again examined to ascertain whether they remained in a secure position.

The plaintiff testified that he had never seen a car of this type before he entered it at 8:30 a. m. on the day of the accident for his regular run between Bluefield and Norfolk; and that he received no instructions from any one as to the difference between it and those to which he had been accustomed. He was not able to see the position of all the stanchions in the car because the mail obstructed his view, and he did not know in what position they were at the top of the car. After leaving Bluefield, he put mail off at various stations, took in smaller quantities of mail at divers points, and made separations for the stations and connecting lines en route. As the train proceeded toward Norfolk, the quantity of mail in the car was reduced and the height of the piles was diminished. The train was due at Petersburg at 4:35 p. m. At Blackstone, Va. (a point 30 miles west of Petersburg), he received a few sacks of mail, and a short time afterward, began to separate it. As he was stooping over to read the label on a sack which he had taken up from the floor, he was struck on the head by a falling stanchion. Prior to the accident he had had no occasion to handle or to move or to examine in any way any of the stanchions in the car. He had moved the mail that was stacked under the stanchion which fell, when he came into the car and had replaced it with other mail. He did not know what caused the rod to fall, or whether it had been resting in a hook or groove or on top of a bracket.

The case was tried in the court below upon the assumption that the common-law rules relating to the duties and liabilities of master and servant should be applied. The plaintiff relied upon the duties of the master to exercise ordinary care to provide a safe place and safe appliances to his employee, and secured an instruction from the court that if the jury believed that these duties had been neglected, and as a result, the plaintiff had been injured without negligence on his part, he was entitled to recover. At the request of the plaintiff, the court also instructed the jury that it was the duty of a master to use due care not to expose his servant to unnecessary risks, and that the master was bound to instruct the servant as to the use and dangers of machinery, when put in charge of dangerous equipment; and that if the equipment of the car was dangerous and the failure of the defendants to instruct the plaintiff was the cause of his injury, then he was entitled to a verdict. Thus it appears that the plaintiff relied at the trial upon claims of negligence on the part of the defendants—(1) as to an unsafe place and unsafe appliances with which to work and (2) as to the failure of the defendants to instruct the plaintiff in regard to the appliances in the car.

In addition to the plaintiff's testimony, a fellow railway mail clerk testified that he saw the car on its maiden trip at Roanoke before the accident and then expressed the opinion that the car was unsafe because the receptacles for the stanchions were not provided with locks or safety catches, and that therefore there was danger that they would fall. This witness did not say that the appliances themselves were defective or in bad condition, and his testimony was limited to the bare expression of personal opinion indicated, without any explanation of how this could occur, except the suggestion that the stanchions might not be properly placed in the receptacles, or might be displaced in the storage of mail in the car, by the workmen. The evidence relied on to support the plain-

tiff's theory that it was negligence to fail to instruct him, was this opinion of his fellow employee; and his own testimony of unfamiliarity with the appliances already noticed.

On the other hand, the testimony of the defendants showed that the car was in all respects safe and of proper construction and that there was no occasion, under the circumstances of the employment, to give instructions to the plaintiff. Numerous witnesses testified to their familiarity with appliances of this sort, and expressed the opinion that they were entirely safe. It was proved by uncontradicted evidence that the car was designed and built by a competent contractor in accordance with specifications furnished to the railway company by the Post Office Department of the United States. It was shown that during the interval of two years between the accident and the trial of the case, 23 railway mail cars, equipped in the same manner as the car in question, had traveled a total mileage of 4,920,808 miles without accident of any kind. Hence the defendants contended that there was no substantial evidence to support the plaintiff's charges of negligence. Moreover, they advanced the argument, well founded in our opinion, that the doctrine of res ipsa loquitur did not apply, because there were other reasonable explanations of the accident than that of negligence on the part of the defendant. See Thompson on Negligence, § 7635. It was conceivable that the bar might have fallen by reason of negligence of the plaintiff, or of the men who stored the mail in the car. In short, it was said that the plaintiff had failed to meet the burden of proof resting upon him under the law.

We think that so far as the primary duties of the defendants to furnish the plaintiff with a safe place and safe appliances are concerned, this contention was correct. The mere opinion of the plaintiff's witness as to the dangerous character of the car, expressed before it had been tested, accompanied as it was with the suggestion that the danger lay in the possibility of improper use of the appliances by fellow servants, was of too unsubstantial a nature, when viewed in connection with the weighty testimony of defendants' witnesses, and the successful use, in more than two years' actual operation, to warrant the submission of this issue to the jury. While it may not be said that the testimony as to the safe character of the car was literally uncontradicted, it was of so conclusive a character as to put an end to the dispute. Patton v. Texas & Pacific Ry. Co.,

179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361, and Gulf, etc., R. R. v. Wells, 275 U. S. 455, 48 S. Ct. 151, 72 L. Ed. 370.

Nor do we think that it was shown that the failure to instruct the plaintiff was actionable neglect in this case. It is the duty of the master to warn his servants of new dangers caused by a change of appliances. Chesapeake & O. Ry. Co. v. Peyton (C. C. A.) 253 F. 734. But, as we have seen, the equipment was not dangerous. It is true that if the plaintiff had been warned to examine the suspended stanchions, he might have avoided the injury if it be assumed that it was caused by improper handling of the appliances by his predecessors in the car. But this possibility merely tends to show that the dangers flowing from carelessness on their part were not so obvious as to warrant a ruling by the judge that the plaintiff voluntarily assumed them. Since the appliances themselves were safe, if carefully handled, the mere failure to instruct him did not amount to negligence on the part of the defendants. An employer has the right to assume, if his servants be competent, that they will not be negligent, and ordinarily it is not his duty to warn an employee of dangers consequent upon negligence of fellow servants unless repeated acts of negligence by them raise a presumption of knowledge of the dangers on the master's part. 39 C. J. 498. Whether or not the defendants are responsible to the plaintiff for the negligent handling of the appliances by his fellow employees is a question that will be presently considered.

The defendants prayed the court for a directed verdict, and the foregoing discussion indicates that this action would have been proper, if common-law rules were applicable. For it is obvious that, there being no evidence of an unusual motion of the railroad car itself, such an accident could have been produced only by one of three causes, or some combination of them; that is, by faulty equipment, by the negligence of the plaintiff, or the negligence of his fellow employees who packed the car before it left Cincinnati. The first theory is not tenable, as we have seen. The second was eliminated, so far as the present record is concerned, by the verdict of the jury. Recovery by the plaintiff was conditioned by instructions offered in his behalf and given by the court, upon the absence of negligence on his part contributing to the accident. In addition, the court of its own motion instructed the jury that it was the plaintiff's duty to act so that he would not

make danger, where danger did not of itself exist; that he must not contribute to his own hurt, and that if he did so, he could not recover; that it was his duty to care for the property committed to his charge, and to act as a reasonably sensible man would do under the circumstances.

There remains only the explanation that the fellow employees of the plaintiff, who packed the car before it left Cincinnati on its journey, failed to place carefully the stanchions in the receptacles intended for them so that they were improperly secured and fell during the journey. The evidence of these men was introduced by the defendants, and it shows that at least one-half of the stanchions were removed from the upright position and placed in the overhanging receptacles in order to permit the mail to be stacked solidly in a large part of the car. The mail was then introduced and piled high in the car. After this had been done, there was a casual examination of the car by the men before it was closed, but the rods or stanchions were not carefully inspected to ascertain whether they had been in any way displaced from the receptacles, during the storage of the mail. The fact that the stanchion fell, when considered with the testimony of plaintiff that he had done nothing to dislodge it, was some evidence that it had not been properly placed in the receptacle in the first instance or that the employees who loaded the car had negligently dislodged it.

Even on this theory, the defendants would have had no liability at common law. The plaintiff, however, now suggests, apparently for the first time in the case, that the common law should not be applied but either the provisions of the Virginia statute, codified as section 5791 of the Virginia Code of 1930 (because the accident happened in Virginia), or the Federal Employers' Liability Act, codified in 45 USCA § 51, should govern; and that under both of said acts, employees may recover not only for the negligence of their employers, but also for the negligence of fellow employees. But it is clear that the Virginia act has no application to this case, for it is limited to common carriers by railroad engaged in intrastate commerce, and injuries to employees while engaged in interstate commerce are expressly excepted. Shumaker's Adm'x v. A. C. L. R. Co., 125 Va. 393, 99 S. E. 739. The situation is different in our opinion with regard to the federal act, which provides in substance that every common carrier by railroad, while engaged in interstate commerce, shall be liable in damages to any person suffering injury while employed by such carrier in such commerce *resulting in whole or in part from the negligence of any of the officers, agents or employees of the carrier,* or by reason of any defect or insufficiency due to its negligence in its rolling stock or appliances.

The applicability of this statute to the railway company and to the express company in this case depends upon the character of business in which they were engaged and upon the relationship between them and the plaintiff. The uncontradicted evidence is that the plaintiff was employed and paid by the express company, but that he was loaned or furnished by the express company to the railway company and was engaged upon the latter's business at the time of his injury. The contract between the two defendants, with relation to the plaintiff's employment, if any written contract existed, was not introduced in evidence, but the proof shows that the express company merely furnished the men to operate the mail storage cars, and it had no supervision over the cars or over the work while it was being performed. On the contrary, the men, while so engaged, were considered "100% railway employees." While the testimony on the point is not as explicit as it might be, there can be no doubt that for the purposes of this case the plaintiff must be considered as an employee of the railway company. The defendants prayed the court to instruct the jury that the relation between employer and employee existed between the railway company and the plaintiff at the time of the accident, and the court in its charge gave substantially this instruction to the jury. These circumstances distinguish the case at bar from Robinson v. B. & O., 237 U. S. 84, 35 S. Ct. 491, 59 L. Ed. 849, wherein it was held that a Pullman porter, employed by a corporation which supplied its own facilities, selected its own employees, and supervised the performance of their tasks, was not included amongst those to whom a railroad company is liable under the federal statute. In the case at bar, on the other hand, the plaintiff, as an employee of a common carrier by railroad, engaged in interstate commerce, was entitled to the provisions of the act.

But the express company does not come within the terms of the act. It was held in Wells Fargo & Co. v. Taylor, 254 U. S. 176, 41 S. Ct. 93, 65 L. Ed. 205, that an express messenger was not entitled to sue an express company under the act since the words "common carrier by railroad" do

not embrace an express company conducting its business under an arrangement with a railroad company, whereby the express company was granted the exclusive privilege of conducting the express business over the railway's lines. The court held that the affairs of the two companies were distinct and separate, and that an employee of the express company was not an employee of the railroad company under the terms of the act. The liability of the express company in the instant case must therefore be determined by the common law of Virginia; and under it, the plaintiff has no legal claim against the express company for the negligence of his fellow servants—even though they be servants of the express company itself.

It follows that if it should clearly appear from the record that the verdict of the jury was based on the negligence of the men who stored the car with mail, the finding would not support a judgment against the express company, but would be sound so far as the railway company is concerned. It is true that the pleadings make no mention of the federal act, but on the contrary state a case under the local law; for the declaration asserts that the plaintiff was the employee of the express company, and fails to say that he was also employed by the railway company. Moreover, the instructions requested and given by the court indicate that the rules of the common rather than of the federal law were to be applied. But neither of these circumstances prevents the application of the federal act, as the Supreme Court has repeatedly decided. Thus in Missouri, Kans. & Texas Ry. v. Wulf, 226 U. S. 570, 33 S. Ct. 135, 57 L. Ed. 355, Ann. Cas. 1914B, 134, it was contended that the complaint failed to state a cause of action under the federal act, but was grounded upon the state statute. But it was held that the trial court was presumed to be cognizant of the enactment of the Federal Employers' Liability Act (45 USCA §§ 51–59), and to know that it had the effect of superseding state laws upon the subject; and that therefore the pleader was not required to refer to the federal act and his reference to the state statute was immaterial. See also St. Louis, San Francisco Ry. v. Seale, 229 U. S. 156, 161, 33 S. Ct. 651, 57 L. Ed. 1129, Ann. Cas. 1914C, 156; Toledo, St. L. & West. R. R. Co. v. Slavin, 236 U. S. 454, 458, 35 S. Ct. 306, 59 L. Ed. 671; Grand Trunk Ry. Co. v. Lindsay, 233 U. S. 42, 48, 34 S. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168; Chicago, Rock Island & Pacific Ry. v.

Wright, 239 U. S. 548, 36 S. Ct. 185, 60 L. Ed. 431; Chicago, Rock Island & Pacific Ry. v. Ward, 252 U. S. 18, 23, 40 S. Ct. 275, 64 L. Ed. 430; Grand Trunk Ry. v. Thrift, 68 Ind. App. 198, 210, 115 N. E. 685, 116 N. E. 756.

The judgment of the District Court might be reversed as to the express company and affirmed as to the railway company, if it should appear that the instructions to the jury, although based on the rules of the common law, were not prejudicial to the latter defendant. But we are unable to reach this conclusion. The jury was wrongfully instructed, over the defendants' objections, that it might base a verdict for the plaintiff on the alleged dangerous character of the devices, or on the failure of the defendants to instruct the plaintiff; and it is impossible to determine whether the verdict rendered was based on one or both of these untenable grounds or on the finding, which would have some support in the evidence, that the stanchion fell because it was improperly placed in a receptacle. By reason of this uncertainty, the judgment must be reversed as to both defendants.

Reversed and remanded.

NORTHCOTT, Circuit Judge, dissents.